GRINNELL *v.* CARBIDE & CARBON CHEMICALS CORP.

SHEPARD *v.* SAME.

1. EXPLOSIVES—PROXIMATE CAUSE—PYROFAX—FINDING OF COURT—
EVIDENCE.

In actions against manufacturer of pyrofax for personal injuries
sustained by owner, his wife and a guest on a 38-foot double
cabin cruiser, motored by engine fueled with ethyl gasoline
stored in tanks beneath cockpit at stern and in which cruiser
had been installed cooking equipment using pyrofax, a hydro-
carbon liquefied gas composed principally of propane, heavier
than air, stored in tanks located on the bridge deck at the
starboard side of the controls in a locker ventilated by four
½-inch holes on the inboard side and six holes in the bottom
and opening into the engine room, in an explosion while the
owner was using stove for the second time in the day in pre-
paring a light repast about 10:30 p. m., some two hours after
boat was docked, evidence *held,* to justify finding that pyrofax
was only substance exploded, where gasoline line was turned
off at engine, there was no gasoline odor in the bilge and tank
of pyrofax last used was so constructed that its horizontal in-
stallation would necessarily result in an explosion.

2. SAME—PYROFAX—INSTALLATION—VENTILATION.

In actions against manufacturer of pyrofax for injuries sus-
tained by cruiser owner, his wife and guest when defendant's
product exploded, record *held,* to justify finding that defend-
ant's district sales manager had represented to owner that
pyrofax was inflammable but not explosive and was entirely
safe, such manager and a dealer had installed the cooking
equipment in which it was used and manager knew installation
was unsafe because of insufficient ventilation.

3. PRINCIPAL AND AGENT—APPARENT AUTHORITY—EVIDENCE.

In action against principal by one dealing with an agent, the
apparent authority of the latter must be gathered from all the
facts and circumstances properly admitted in evidence.

4. SAME—ESTOPPEL TO DENY AGENT'S AUTHORITY.

   A principal, who has placed his agent in such a situation that a
   third person of ordinary prudence, conversant with business
   usages and the nature of the particular business, is justified
   in assuming agent is authorized to perform a particular act in
   behalf of the principal, is estopped to deny agent's authority
   to perform it.

5. SAME—DISTRICT SALES MANAGER—WARRANTY—INSTALLATION OF
   EQUIPMENT.

   District sales manager of pyrofax manufacturer *held*, to have
   had apparent authority to make warranty as to safety of use
   of pyrofax gas and to assist in choosing location for and in-
   stallation of equipment on cruiser, owned by one of plaintiffs,
   in action for personal injuries resulting from explosion, since
   his business was the sale of pyrofax and he had the duty to
   promote that business.

6. EXPLOSIVES — PYROFAX — INSTALLATION — MANUFACTURER'S LIA-
   BILITY.

   Improper installation of equipment for using pyrofax and con-
   tinued furnishing of it for use in such equipment known to be
   faulty *held*, chargeable to defendant manufacturer whose dis-
   trict sales manager and dealer installed the equipment, not-
   withstanding dealer may have been an independent contractor.

7. NEGLIGENCE—DELEGATION OF PERFORMANCE OF A DUTY TO AN IN-
   DEPENDENT CONTRACTOR.

   One who owes a duty to another cannot acquit himself of lia-
   bility by delegating performance of the duty to an inde-
   pendent contractor.

8. SAME—PERFORMANCE OF WORK NECESSARILY INVOLVING DANGER
   TO OTHERS—DELEGATION OF DUTY.

   Duty of employer engaged in work necessarily involving danger
   to others, unless great care is used, to make such provision
   against negligence as may be commensurate with the obvious
   danger may not be delegated to another so as to avoid liability
   for its neglect.

9. EXPLOSIVES—CONTRIBUTORY NEGLIGENCE—IMPUTED NEGLIGENCE—
   PYROFAX—INSTALLATION OF EQUIPMENT.

   In actions by guest, wife of owner and owner of a cruiser in
   which cooking equipment for use of defendant manufacturer's
   pyrofax had been improperly installed by its agent, record

*held,* not to show owner had knowledge, prior to explosion, that anything was wrong with the system as gas had been furnished defendant after the installation or that owner had special knowledge of the dangers of pyrofax so as to be guilty of contributory negligence imputable to his wife and guest.

10. SAME—NEGLIGENCE—RESALE OF REGULATOR EQUIPMENT.

Defendant manufacturer of pyrofax used in equipment sold to cruiser owner and installed in his cruiser *held,* not relieved from liability to plaintiffs who sustained injuries when pyrofax gas exploded, because regulator equipment had been purchased from a reputable manufacturer for resale as a vendor without any knowledge of its defective condition, where explosion was caused by faulty and dangerous installation of the equipment, largely because of failure to establish proper outside ventilation together with failure to furnish a tank of pyrofax equipped with an eduction tube.

11. NEGLIGENCE—EXPLOSIVES—LIABILITY FOR INJURIES.

One who delivers an article, which he knows to be dangerous or obnoxious, to another person without notice of its nature and qualities is liable for any injury which may reasonably be contemplated as likely to result, and which does in fact result, therefrom, to that person or any other who is not himself at fault.

12. DAMAGES—TREATMENT OF INJURIES IN A DISTANT OUT-OF-STATE HOSPITAL.

Expenditure by plaintiff of $3,000 for several trips to a distant out-of-State hospital to receive treatment for severe injuries received in explosion of pyrofax which had been furnished by defendant manufacturer for use in cooking equipment it had had improperly installed on plaintiff's cruiser *held,* not unreasonable under the circumstances.

13. SAME—PERSONAL INJURIES—EARNING CAPACITY—EXPENSES FOR CURE—PAIN.

In determining whether or not damages allowed in a personal injury case are excessive, the facts and circumstances of the particular case must be inquired into; the age and general health of the injured party; his earning power prior and subsequent to the injury; disability left as a result of the injury; amount of money expended for cure together with the pain suffered are all elements to be considered.

14. BANKRUPTCY—TORT CLAIMS DO NOT PASS TO TRUSTEE BY OPERA-
TION OF LAW.

A cause of action for damages arising out of a personal wrong
suffered by the bankrupt is not embraced in the description of
property, the title to which, by operation of law, vests in the
trustee of the bankrupt (11 USCA, § 110).

15. SAME—PERSONAL INJURIES—ASSIGNMENT OF CAUSE OF ACTION.

Cause of action of guest who was injured in an explosion on a
cruiser and which he did not assign to trustee, appointed upon
his adjudication in bankruptcy after injuries were received,
*held*, not to have passed to such trustee (11 USCA, § 110).

16. APPEAL AND ERROR—BURDEN OF PROOF—ADMISSION OF TESTI-
MONY—MOTIONS FOR DIRECTED VERDICT AND NEW TRIAL.

Trial court in actions for personal injuries suffered when explo-
sion occurred on a cruiser *held*, to have made proper disposi-
tion of matter of burden of proof, admission of testimony,
and motions for a directed verdict and new trial.

17. DAMAGES—EXCESSIVENESS.

Award by trial court, sitting without a jury, to owner of cruiser,
his wife and a guest of $100,000, $36,000 and $12,500, re-
spectively, for damages because of various personal injuries
suffered from explosion of pyrofax, manufactured and fur-
nished to owner for use in cooking equipment defendant had
improperly installed on the cruiser, *held*, so excessive by $27,-
500, $16,000 and $3,500, respectively, as to shock the judicial
conscience.

18. COSTS—REMITTITURS.

In actions for personal injuries tried by court without a jury,
where amounts awarded the several plaintiffs are found exces-
sive in substantial amounts, costs are granted defendant if no
remittiturs are filed as case stands reversed but no costs are
awarded either party if remittiturs are filed.

Appeal from Wayne; Moll (Lester S.), J. Sub-
mitted April 22, 1937. (Docket Nos. 98, 99, 100,
Calendar Nos. 39,399, 39,400, 39,401.) Decided De-
cember 15, 1937.

Separate actions of case by Ida V. Grinnell, Alva
L. Grinnell and James B. Shepard against Carbide
& Carbon Chemicals Corporation, a New York cor-

poration, for personal injuries and property loss sustained in an explosion of cooking equipment on board a cruiser. Cases consolidated for trial and appeal. Judgments for plaintiffs. Defendant appeals. Reversed with new trials unless remittiturs are filed.

*Monaghan, Crowley, Clark & Kellogg,* for plaintiffs.

*Frederick J. Ward, Kerr, Lacey & Scroggie (Ashley T. Cole* and *Wilfred C. Roszel,* of counsel), for defendant.

SHARPE, J.   Each of the above named plaintiffs instituted an action to recover damages for injuries sustained in an explosion aboard the yacht Alvida owned by plaintiff Alva L. Grinnell and moored at Algonac on the evening of July 3, 1933. The explosion occurred at approximately 10:30 p. m., wrecking the boat and causing serious injuries to plaintiffs. The actions were tried together and the following facts were found by the trial judge:

The yacht Alvida was purchased by Mr. Grinnell in the spring of 1931 and was operated by him as a pleasure craft from the time of the purchase until the time of the explosion. The boat was known as a 38-foot double cabin Mathews cruiser. In the bow of the boat was a chain locker, a water tight bulkhead separated the chain locker from the forward toilet; there was a small door opening from the forward bulkhead into the chain locker. On the starboard side of the forward cabin was a locker with a door opening inboard. There was also a locker space under the seat on the port side, steps led from the forward cabin up to the bridge deck which ran the width of the ship and occupied a space of six feet

eight inches fore and aft. The wheel and controls were in the bridge deck, on the starboard of which was a locker hereafter referred to as the pyrofax locker. Under the bridge deck was a motor compartment occupying a space the width of the ship and six feet eight inches fore and aft. Access was had to the motor compartment by a double hatch opening into the bridge deck. Three steps ran from the bridge deck to a passageway leading to the after cabin. Two steps led up from the after cabin to the cockpit, under which were two 60-gallon gasoline tanks. Access was had from the after cabin to the gasoline tanks through a small door under the steps leading to the cockpit. Each gasoline tank was equipped with a shut-off valve and the gas line ran from the tanks along the port side of the boat to the engine room. There were two places at which the gas could be turned off or on, namely, at the tanks or at the valve in the line in the engine room.

*Ventilation.* The importance of this subject will later be revealed and to that end we describe somewhat in detail the method of ventilation in operation in the yacht. The yacht was constructed entirely of wood. The hull was built of planking and air could circulate through the bilge space up or down the sides of the boat between the ribs and between the skin of the interior construction. The forward engine room bulkhead below the deck was closely fitted but not air and water tight, only the forward bulkhead between the chain locker and forward toilet was air and water tight. The motor compartment was originally ventilated by a goose-neck ventilator leading from the floor of the bridge deck into the motor compartment below, but in the spring of 1932 an air line was run in from the port side of the bottom of the motor. The motor was placed on heavy

stringers so that there was a space of six or eight inches between the bottom of the motor and the keel. On the starboard side of the engine compartment there was a water tank and on the flooring were the storage batteries. The pyrofax locker was on the starboard side of the bridge deck just forward of the ice box. It was approximately two feet wide, five feet long and about 16 inches in depth. The bottom of the locker was the deck of the bridge cabin. The top was removable and was covered by a cushioned seat. On the inboard side were four holes, one-half inch in diameter and six holes in the bottom of the locker which remained after the removal of a former gas cooking equipment.

In the pyrofax locker there was installed a system which consisted of two supply tanks of pyrofax laid side by side in a horizontal position on the floor, a manifold and reducing valve, a mercury seal and connecting pipe leading to the stove. Copper tubing ran from couplings at the pyrofax tanks to the manifold, permitting each tank to be turned on or off at the manifold. The manifold was connected to a regulator valve, which in turn was connected to a mercury seal or mercury relief valve. Copper tubing ran from the relief valve through the floor of the locker into the engine room through the galley pan locker up to the stove.

*The explosion.* On the day of the explosion, Mr. and Mrs. Grinnell left the Detroit Yacht Club aboard the Alvida about 4.30 or 5 p. m., a stop was made and 50 gallons of gasoline were placed in the tanks. The yacht was then run up the Detroit river across Lake St. Clair and up the St. Clair river to Algonac where it came into Campeau slip about 8:30 p. m. Before leaving the yacht club, the stove was in use with tank No. X–1042 hooked up, but upon departure

the stove was shut off and not again used until the boat entered the St. Clair river. It was then continued in operation with one or more burners lighted during the preparation of the evening meal.

After the boat came to anchor, Messrs. Shepard and Mathews came aboard for a visit, during which time Mrs. Grinnell continued her preparation for the evening meal. She noticed the gas was running low and had Mr. Grinnell shut off tank X–1042 and connect up and turn on tank X–924 which had never before been used. Mr. Grinnell turned on this tank first at the reduction valve, then at the tank, after which the stove was in use with all burners being lighted for some time, and thereafter with the center burner lighted for about 45 minutes during which time Mr. and Mrs. Grinnell had dinner aboard. After dinner Mr. Grinnell went to the galley where he prepared fresh coffee and placed the coffee pot on the middle burner of the stove. After a few minutes Mr. Grinnell went down to get the fresh coffee and, in doing so, he passed to the bridge deck where he opened the top of the pyrofax locker and turned off tank X–924 at the tank as was his custom when the use of the stove was to be discontinued, lowered the lid of the pyrofax locker, and proceeded to the galley where the center burner was still burning under the coffee pot. As he was about to reach for the coffee pot the explosion occurred.

The explosion practically demolished the boat with the exception of the hull and caused serious injuries to Mr. and Mrs. Grinnell and Mr. Shepard who was on board the boat at the time of the explosion. Immediately after the explosion a flame shot up in the vicinity of the pyrofax equipment and another but smaller flame at about the location of the galley. At a later date inspections were made and the pyrofax equipment was found to be intact

with both tanks completely shut off; the top was gone off the pyrofax locker and the inboard side had been blown inward. The gasoline was found to have been turned off in the engine room at the deck control, but not off at the tanks. The explosion occurred throughout the galley, bridge deck, pyrofax locker, motor compartment and spaces adjacent thereto; and the court found that the explosion resulted from the ignition by the flame in the stove of an explosive mixture of pyrofax gas and air.

*Agency.* In March, 1932, Mr. and Mrs. Grinnell were living in a two-family flat in the city of Detroit. About this time, a Spencer Bedell and his mother engaged the other flat owned by Grinnell and wife. When the parties first met, Bedell handed Mr. Grinnell a business card which bore the name of Bedell, defendant company, and the address and telephone number of the company's local office. In April, 1932, Alva Grinnell and Bedell discussed the installation of a pyrofax cooking equipment on the Alvida. Bedell stated that pyrofax was perfectly safe, being inflammable, but not explosive. He offered to provide the system and asked Grinnell to measure the place for the stove. The stove was ordered by Bedell and shipped to the Grinnell residence, then it was taken and placed on board the Alvida. Alva Grinnell, Bedell and one Ritter inspected the boat for a suitable place for installation and finally selected the bridge deck locker. Bedell and Ritter then proceeded to make the installation and upon its completion, the equipment was tested, after which Bedell and Ritter gave Grinnell certain instructions as to its use and operation. The installation above mentioned was made in May, 1932, at which time there was no dealer for the sale of pyrofax equipment in Detroit. Prior to and at the time of installation, Ritter was acting as a service man out of Bedell's office. Grinnell sub-

sequently paid Bedell the sum of $37.50 to cover the cost of installation. The first invoice for tanks bears the date April 29, 1932; thereafter Grinnell ordered from the defendant company and paid for several other tanks of pyrofax used through the season of 1932, and until the explosion in 1933. The last tank ordered and invoiced was tank X–924 April 28, 1933, and paid for on May 11, 1933.

Bedell's business cards were supplied by the defendant's home office upon order. Bedell solicited the sale of pyrofax gas; deals for the sale of gas were reduced to a contract and sent to the main office in New York for its O. K.; and Bedell customarily forwarded such contracts for approval and the equipment was supplied by dealers and not by Bedell.

*Injuries and damages.* At the time of the explosion Mr. Grinnell was 38 years of age and in good health. He was a manufacturer's agent for General Alloys in the business of selling heat-resisting castings to manufacturers. He was the sales representative for the State of Michigan until the early part of 1934 and the latter part of 1934 his territory was reduced so that he now has only a part of the city of Detroit, one company in Pontiac and one in Jackson. He also represented Rustless Iron Corporation in Michigan, Illinois, Ohio and Pennsylvania, but was not their exclusive agent. His net income from and including the year 1929 to the end of the year 1934 varied between $3,418.37 to $30,870.45 for each year. At the date of trial, his contract with Rustless Iron Corporation was at an end and in general his volume of business has been reduced to about one-half of what it formerly was.

After the explosion Alva Grinnell was removed to Algonac and then to a hospital in Mt. Clemens. On July 4, 1933, he was removed to Providence hospital

in the city of Detroit, where an operation was performed. He remained there until January 4, 1934. On January 10, 1934, Grinnell went to Rochester, Minnesota, where he remained five weeks. In October, 1934, he returned to Rochester for X-rays and examination. He again returned in January and September, 1935. Mr. Grinnell has expended more than $20,000 in doctor bills, hospitalization, nursing and medicine for himself and Mrs. Grinnell; and other moneys for the hire of a housekeeper to perform household duties that Mrs. Grinnell was unable to perform. The property loss on the boat over and above the insurance was $1,250.

Mrs. Grinnell was 34 years old at the time of the accident. She also was taken to the hospital in Mt. Clemens and later removed to Providence Hospital. Her right foot was injured and X-rays disclosed a compound fracture. Her left foot was badly lacerated. Mrs. Grinnell remained in Providence Hospital two and one-half months and later went to the Mayo clinic. In January, 1935, she returned to the Mayo clinic where she remained 10 weeks. In February, 1935, both feet were operated on and some bone removed from the right foot and also from the left foot. Mrs. Grinnell again returned to the Mayo clinic in May and August of 1935 for further treatment. In addition to the injury to her feet, Mrs. Grinnell received lacerations about the head and face leaving scars. She also suffered injury to her eyes with permanent injury to the retina of the left eye.

Mr. Shepard is 42 years of age. In 1933, he was in the novelty furniture business. He also suffered bruises and a broken leg with a fracture and partial displacement of the ankle bone. The injury left Mr. Shepard with a limitation of action in his right ankle. His actual expenses as a result of the injury were about $2,500.

The trial court found in favor of all three plaintiffs and awarded damages as follows: Alva L. Grinnell—$100,000; Ida V. Grinnell—$36,000; and James B. Shepard—$12,500.

The defendant appeals and contends that plaintiffs did not sustain the burden of proof; that the trial court was in error in admitting certain testimony relative to the regulating equipment used on the Alvida from tests made by experts subsequent to the explosion, the claim being made that there was no competent evidence to show that prior to the explosion the condition and adjustment of the regulating equipment was identical with its condition and adjustment at the time the experiments were made; that there was no evidence tending to prove that the regulating equipment, piping and appliances were furnished and installed on the Alvida by defendant's agents acting within the scope of their authority or apparent authority; that there was no evidence that Grinnell relied upon the authority of Bedell or Ritter to furnish and install equipment; that the trial court's finding relative to pyrofax gas as the alleged proximate cause of the explosion was predicated upon inferences, speculations and possibilities; that if the accident resulted from a defective condition of the regulator then defendant is free of all liability and negligence as defendant purchased the regulator from a reputable manufacturer for resale as a vendor and had no knowledge of such defective condition; that defendant is not guilty of any negligence with respect to cylinder X–924 as, prior to the delivery of said cylinder, defendant did not know that the use of a cylinder of that type in a horizontal position would be dangerous; that Grinnell was guilty of contributory negligence which was imputable to Mrs. Grinnell and Shepard; that the pre-

ponderance of evidence shows that the explosion was caused by gasoline vapors for which defendant is not liable; that the judgments entered were grossly excessive; that the trustee in bankruptcy of the estate of Shepard was the real party in interest; that the trial court was in error in not granting defendant's motion for a directed verdict at the close of all evidence; and that the trial court should have granted defendant's motion for a new trial.

Plaintiffs contend that defendant is liable because:

1. The chemical sold under the trade name "pyrofax" is an inherently dangerous explosive;

2. The installation on the Alvida was an inherently and imminently dangerous one;

3. This hazardous installation was made by the defendant for either or both of two reasons:

a. Because Bedell, acting in the scope of his actual and customary authority installed it—or

b. Because Ritter, who, in point of time as close as June of 1932 and also in April of 1933, was a representative of pyrofax "sales and service," assisted in the installation. He was either an agent of the company or an independent contractor, but since he was installing an inherently dangerous explosive his status of "independent contractor," if such, in truth, it was, would not relieve the defendant of liability.

4. Regardless of who installed, be it a stranger or even a trespasser, the defendant, through Bedell, knew on at least three later occasions that the Alvida's installation was an imminently dangerous one since it was in a box inside the boat and unvented to the outside. Yet the defendant continued to supply the chemical. Having knowledge of this hazardous installation, it was negligent of the defendant to deliver *any* type of tank whatsoever;

5. Having knowledge of Grinnell's horizontal-tank installation, it was the duty of the defendant to deliver, for use with such an installation, only tanks which could be used safely in a horizontal position; that is to say, tanks with interior tubes;

6. The negligent delivery of a tank of pyrofax having no interior tube, the lack of which allowed liquid pyrofax to reach the regulating valve, made the explosion certain to happen. Even if the proper tanks were delivered an explosion was possible because of the venting inside, and defendant knew that it was possible. But with the delivery of X–924 an explosion was as inevitable as if a time bomb had been delivered to the ship.

The explosion occurred July 3, 1933, a jury was waived, the trial began October 21, 1935, and concluded February 5, 1936, and the cause was submitted during the April term of our calendar. The record contains more than 1,800 pages of printed matter and the briefs filed contain about 500 pages replete with citations and authorities.

It appears to us that the primary question involved in this cause is to fix the cause of the explosion. The trial court found that when the explosion occurred there were two explosive substances upon the boat, namely, pyrofax and ethyl gasoline; that in order to produce an explosive mixture, it is necessary that either pyrofax gas or fumes from liquid gasoline escape into and mix with air; that pyrofax is a trade name for a hydrocarbon liquefied gas composed principally of propane; that it is a gas intended to be burned as gas in a stove or hot plate; that it may be kept as a liquid while under pressure; that it vaporizes or boils at approximately minus 44 degrees Fahrenheit; that it is explosive when mixed with air in certain proportions; that it is colorless, invisible, odorless and inflammable and one and a

half times as heavy as air, hence upon escape has a tendency to seep downward; that on the boat at the time of the explosion there were two tanks, X–1042 and X–924 installed horizontally. Tank X–924 was without an eduction tube that should run from the outlet valve up to the gas space above the level of the liquid; that the purpose of this tube is to permit only gas to pass into the system and to eliminate the possibility of liquid pyrofax entering the system; that the use of tank X–924 without the eduction tube caused liquid pyrofax to flow into the system, thus causing increased pressure with a consequent discharge of gas through the mercury seal; and that as a result of using tank X–924 gas was discharged into the pyrofax locker and in turn seeped through the holes in the bottom and the inboard side of the locker.

We are in accord with the finding of the trial judge that gasoline was not the cause of the explosion. This conclusion is fortified by the fact that following the explosion there was no fire on the boat except a hot flame in the vicinity of the pyrofax equipment and a smaller flame at or near the location of the galley; that there was no gasoline or gasoline odor in the bilge; that the pyrofax system was so installed that when the safety valve of the equipment discharged gas, it would be discharged inside the boat in a box with holes in it leading directly to the engine room; and that such gas by reason of its weight would sink to the lowest part of the boat. With gasoline eliminated as the cause of the explosion, it must follow that pyrofax, being the only other explosive substance on board the boat, was the cause of the explosion.

Having determined that pyrofax together with the method of installing the equipment was the cause of the explosion, the next question that presents itself

is the liability of defendant company; such liability, if any, centers around the activities of Bedell and Ritter in their separate connections with the sale and installation of the pyrofax equipment, together with certain subsequent events that will be hereafter related. The facts in connection with Bedell in his relationship to plaintiff Grinnell and defendant company are that Bedell entered the employ of defendant company in 1927 as a salesman. His territory was a part of New Jersey and the southern part of New York. In 1930, the defendant company transferred him to Detroit. His position there was district sales manager. He had charge of all dealers in Michigan and reported monthly the business in Michigan. He sold pyrofax gas directly to the public.

Ritter advertised himself as a distributor of pyrofax gas, sales and service. His bill heads listed his office the same as defendant company's local Detroit office. His telephone number as listed on the bill heads was the same as the telephone number of defendant company's office. On occasions he assisted Bedell in making installations and getting new business. In 1932, the pyrofax system was installed on the Alvida and the record sustains the finding that before the sale was made to Grinnell, he was informed by Bedell that while pyrofax gas was inflammable, it was not explosive and was entirely safe; that shortly after this assurance was given, Grinnell decided to have the installation made and instructed Bedell to go ahead and install the equipment. In May, 1932, the system was installed. In the process of making installation Bedell and Ritter decided where it should be placed. The record also shows that Bedell knew that the installation was unsafe, the same not providing for a venting of the gas by boring a hole through the side of the boat; and that

subsequent thereto Bedell knew that this safety measure had not been provided for.

In *Faber* v. *Eastman, Dillon & Co.,* 271 Mich. 142, 145, we said:

"It is elementary that persons dealing with an agent may rely on his apparent authority (*Marx* v. *King,* 162 Mich. 258), and that such authority is to be gathered from all of the facts and circumstances properly admitted in evidence. *Haines* v. *Leonard Warehouses, Inc.,* 199 Mich. 580; *Kerns* v. *Lewis,* 249 Mich. 27. This question was discussed at length by Mr. Justice McDONALD, speaking for the court, in *Maryland Casualty Co.* v. *Moon,* 231 Mich. 56, and the following from 21 R. C. L. p. 856, was quoted with approval (p. 62):

" 'Whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of the principal the particular act, and such particular act had been performed, the principal is estopped from denying the agent's authority to perform it.' "

One of the elements relied upon by plaintiffs to prove the agency of Bedell was the business card of Bedell which indicated that he represented defendant company.

In *Randall* v. *J. A. Fay & Egan Co.,* 158 Mich. 630, we said:

"This agent was described in the letterheads which he used as the agent for Michigan. These letterheads were shown to have been in possession of the plaintiff. Letters were produced from the defendants which contained this letterhead. The circulars issued described Jenks as the Michigan agent, and we think the inference of authority from this description is clear. See *Leo Austrian & Co.* v. *Springer,* 94 Mich. 343 (34 Am. St. Rep. 350), and *Westinghouse Co.* v. *Gainor,* 130 Mich. 393."

See, also, *Marx* v. *King*, 162 Mich. 258; *Theisen* v. *Detroit Taxicab & Transfer Co.*, 200 Mich. 136 (L. R. A. 1918 D, 715).

The facts also show that after the installation was made the defendant company supplied Grinnell with pyrofax for use in that particular equipment.

In *Leviten* v. *Bickley, Mandeville & Wimple, Inc.* (C. C. A.), 35 Fed. (2d) 825, the court quoted the following from *Law* v. *Cross*, 1 Black (66 U. S.), 533, 539: "He (the principal) cannot, by holding his peace and apparent acquiescence, have the benefit of the contract if it should afterwards turn out to be profitable, and retain a right to repudiate if otherwise," and stated, "This case was cited with approval in *Clews* v. *Jamieson*, 182 U. S. 461, 483 (21 Sup. Ct. 845)."

In the case at bar, the facts substantiate plaintiffs' claims that Bedell had apparent authority to do the thing he did. His business was the sale of pyrofax and it was Bedell's duty to promote that business. The improper installation of the equipment and the continued furnishing of pyrofax for use in such equipment known to be faulty is chargeable to defendant company, but it is claimed by defendant company that Ritter was an independent contractor and as such they are not chargeable with his acts.

In the case of *Wight* v. *H. G. Christman Co.*, 244 Mich. 208, the defendant had hired an independent contractor to operate a steam shovel. Sparks from the steam shovel caused a fire in the plaintiff's house. The court spoke as follows:

"The mere fact that Gohr (the steam shovel operator) was an independent contractor would not of itself excuse Christman company (the defendant) from liability. Where one owes a duty to another,

he cannot acquit himself of liability by delegating performance of the duty to an independent contractor. *Peerless Manfg. Co.* v. *Bagley,* 126 Mich. 225 (53 L. R. A. 285, 86 Am. St. Rep. 537); *Lauer* v. *Palms,* 129 Mich. 671 (58 L. R. A. 67); *Blickley* v. *Luce's Estate,* 148 Mich. 233; *Inglis* v. *Millersburg Driving Ass'n,* 169 Mich. 311 (Ann. Cas. 1913 D, 1174); *Van Dam* v. *Doty-Salisbury Co.,* 218 Mich. 32 (29 A. L. R. 729); *Olah* v. *Katz,* 234 Mich. 112. The Christman company was principal contractor for the erection of the building on the premises in question, and cannot evade liability by the mere fact it hired Gohr to do excavating with a steam shovel. It was bound to see that the excavating, which as a part of its contract it was bound to do, was not done by a subcontractor in a negligent manner. *Inglis* v. *Millersburg Driving Ass'n, supra; Olah* v. *Katz, supra.*

"In *Inglis* v. *Millersburg Driving Ass'n, supra,* the exception to the general rule is pointed out. The language of *Covington & Cincinnati Bridge Co.* v. *Steinbrock & Patrick,* 61 Ohio St. 215 (55 N. E. 618, 76 Am. St. Rep. 375), was expressly approved, and it is said that 'A duty is imposed upon the employer, in doing work necessarily involving danger to others, unless great care is used, to make such provision against negligence as may be commensurate with the obvious danger. It is this duty that cannot be delegated to another so as to avoid liability for its neglect.' In *Olah* v. *Katz, supra,* the negligence of a plumber, employed as an independent contractor, in leaving open and unguarded an excavation, was held to be the negligence of the company which employed him."

·The court in the above cases is merely reaffirming the rule laid down in the case of *Inglis* v. *Millersburg Driving Ass'n,* 169 Mich. 311, 320–322 (Ann. Cas.

1913 D, 1174), in which the court, in part, spoke as follows:

"The supreme court of Ohio in a well-considered case has approved this doctrine, quoting from the leading English cases:

" 'The doctrine of independent contractor, whereby one who lets work to be done by another, reserving no control over the performance of the work, is not liable to third persons for injuries resulting from negligence of the contractor or his servants, is subject to several important exceptions. One of these, applicable as we think to this case, is where the employer is, from the nature and character of the work, under a duty to others to see that it is carefully performed. It cannot be better stated than in the language used by Cockburn, C. J., in *Bower* v. *Peate*, L. R. 1 Q. B. Div. 321, 326 (45 L. J. Q. B. 446, 35 L. T. 321), a leading and well-considered case. It is, "that a man who orders a work to be executed, from which, in the natural course of things, injurious consequences to his neighbor must be expected to arise, unless means are adopted by which such consequences may be averted, is bound to see the doing of that which is necessary to prevent mischief, and cannot relieve himself of his responsibility by employing some one else—whether it be the contractor employed to do the work from which the danger arises, or some independent person—or to do what is necessary to prevent the act he has ordered done from becoming unlawful." It was suggested by Lord Blackburn in *Hughes* v. *Percival*, 8 App. Cas. 443 (52 L. J. Q. B. 719, 49 L. T. R. 189), that this was probably too broadly stated. But in the recent case of *Hardaker* v. *Idle District Council* (1896), L. R. 36 Q. B. Div. 335, 347 (65 L. J. Q. B. 363, 74 L. T. R. 69), the doubt expressed by Lord Blackburn was regarded as unwarranted, and the principle as formulated by Cockburn was adopted and applied. This does not abrogate the law as to independent contractor. It still leaves abundant room for its proper application. "There is" as stated by Cockburn, "an obvious difference between committing work to a contractor to be executed, from which, if properly done, no injurious consequences can arise, and handing over to him work to be done from which mischievous consequences will arise unless precautionary measures are adopted."

" 'The weight of reason and authority is to the effect that, where a party is under a duty to the public, or third person, to see that work he is about to do, or have done, is carefully performed, so as to avoid injury to others, he cannot, by letting it to a contractor, avoid his liability, in case it is negligently done to the injury of another.' *Covington & Cincinnati Bridge Co.* v. *Steinbrock & Patrick*, 61 Ohio St. 215 (55 N. E. 618, 76 Am. St. Rep. 375), and cases cited.

"The principle involved cannot be better stated than it is in the sentence last quoted, *supra*. It is not applied to those cases where the injuries occur which are collateral to the employment, like the dropping of

material by the servant of a contractor upon a person passing by, but where a duty is imposed upon the employer in doing work necessarily involving danger to others, unless great care is used, to make such provision against negligence as may be commensurate with the obvious danger. It is this duty which cannot be delegated to another so as to avoid liability for its neglect.''

It is also contended by defendant company that Grinnell was guilty of contributory negligence which was imputable to Mrs. Grinnell and Shepard. The particular claim made is that Grinnell had knowledge that pyrofax was explosive and was negligent in permitting the installation to be made in the locker and his subsequent use thereof. An examination of the record discloses that Grinnell had no knowledge, prior to the explosion, that anything was wrong with the system. It had been installed by the company's agent and gas furnished by the same company after its installation. He had no special knowledge of the dangers of pyrofax and in our opinion may not be charged with contributory negligence.

It is next contended by defendant that if the regulator equipment was defective, defendant is free from all liability as they purchased the same from a reputable manufacturer for resale as a vendor without any knowledge of its defective condition and cite *Pesavento* v. *E. I. DuPont de Nemours & Co.*, 240 Mich. 434, as authority therefor. In the case at bar the record shows that under certain conditions the use of pyrofax may cause an explosion more powerful than dynamite. The above cited case is not controlling as the explosion was caused by the faulty and dangerous installation of the equipment, largely made so by the failure to establish an outside vent, together with the failure to furnish a tank equipped

with an eduction tube. The record also shows that this condition was known to defendant company.

In *McLawson* v. *Paragon Refining Co.*, 198 Mich. 222, we said:

"In the case of *Wellington* v. *Downer Kerosene Oil Co.*, 104 Mass. 64, it is said:

" 'It is well settled that a man who delivers an article, which he knows to be dangerous or noxious, to another person, without notice of its nature and qualities, is liable for any injury which may reasonably be contemplated as likely to result, and which does in fact result, therefrom, to that person or any other, who is not himself in fault' (citing cases).

"We think it is equally true that one who delivers such an article or substance is liable even though he was ignorant of its noxious character, if in the exercise of ordinary prudence he or his servant should have possessed such knowledge. We take judicial cognizance of the fact that gasoline, either alone or mixed with kerosene, constitutes a highly explosive agent, and that extreme care should be taken by the vendors thereof to prevent their mixture."

See, also, *Warren* v. *Railway Co.*, 141 Mich. 298 (19 Am. Neg. Rep. 21).

*Damages.* In addition to facts heretofore stated relative to the injuries received by the respective plaintiffs, it may also be stated that at the time the cause was tried, Mr. Grinnell was suffering from a permanent disability of the left leg. The knee is stiff and there is a scar extending from a point above the level of the upper quarter of the knee-cap downward a distance of about six inches. The center of this scar is a depressed area adherent to the bone. There is another scar on the leg, extending downward from four inches above the knee, of approximately 10 inches. There is some numbness and loss of sensation in the foot and also some shrinkage of the leg. The record also shows that Mr. Grinnell

expended more than $22,500 as a direct result of the explosion and that a part of this expenditure arose out of the services of the physicians from the Mayo Foundation of Rochester, Minnesota. It is contended by the defendant company that Grinnell can recover only "what that service would have been reasonably worth at the city of Detroit until it is shown that such services could not have been obtained in or near the accident."

In *Sherwood* v. *Railway Co.,* 82 Mich. 374 (4 Am. Neg. Cas. 100), we said:

"It is further contended that the court erred in permitting the plaintiff to testify as to the costs and expenses of her trip to LaPorte, Indiana, and the medical treatment which was given her at the time of her attendance there. The reason of this objection, stated by counsel, is that this treatment was not necessary or usual for an injury of this kind, and that, by permitting this testimony, the court allowed the jury to charge the defendant with the entire expenses of the trip, her board and medical treatment from December 5th until May 28th, following, at the rate of $21.50 per week, including the board of her sister. There was evidence tending to show that the injuries which she received resulted in a produced atrophy of the muscles, and it was thought by her physicians that the electrical treatment which would be given at LaPorte might relieve the difficulty.  *  *  *  The plaintiff suggested going to LaPorte, and Dr. Lawrence told her it would be a good idea, and that it might improve her general health, and indirectly help the health of the muscles. It appears that she was suffering at that time to such an extent from these injuries that she was bedridden, and her general health greatly impaired. She went to LaPorte and took this treatment. Her health and general condition was such that an attendant, or nurse, was necessary. She was entitled, as a part

of her damages, to recover whatever was a reasonable and necessary outlay in her attempt to be cured of the injuries resulting from the negligence of the defendant. It cannot be said, under the circumstances, that this was an unreasonable expenditure. The testimony was properly received. The plaintiff, as it appears, is permanently crippled, and compelled to use a cane or crutch to get about with, or to depend upon some one to assist her.''

In our opinion the $3,000 thus expended was not under the circumstances an unreasonable expenditure.

Defendant also contends that the damages allowed were excessive. In determining whether or not the damages allowed are excessive, the facts and circumstances of the particular case must be inquired into; the age and general health of the injured party; his earning power prior to the injury, his earning power subsequent thereto; the disability left as a result of the injury; the amount of money expended for a cure; together with the pain suffered are all elements that should be taken into consideration in fixing an amount that will compensate one for the injury suffered.

In *Smith* v. *Mt. Clemens Sugar Co.*, 179 Mich. 97, we said:

''Were the damages ($3,800) excessive? Upon this point defendant relied upon the case of *Detzur* v. *B. Stroh Brewing Co.*, 119 Mich. 282 (44 L. R. A. 500, 5 Am. Neg. Rep. 371), where a judgment for $10,000 was reversed unless the sum of $6,500 was remitted. Plaintiff has an expectation of life of more than 12 years. He has lost a portion of his arm. He is unfitted for all kinds of manual labor, by which he has heretofore maintained himself. He testified to continued pain and suffering. Added to these facts, it should be borne in mind that, for the

balance of his life plaintiff must suffer from the humiliation of going about among his fellows in a mutilated condition. While the judgment is a liberal one, we do not think it should be called excessive within the legal meaning of that term.''

In *Chumfoot* v. *St. Clair Tunnel Co.*, 221 Mich. 113, we affirmed an award for $30,000. In that case, as a result of the injury plaintiff's right hand and arm and the soles of both feet were badly burned. Three fingers were completely burned through being held in place by a charred fragment of bone. The fingers and hand were later amputated and at a later time the arm was amputated just below the elbow. We there said:

"In the recent case of *Fishleigh* v. *Railway*, 205 Mich. 145, the question of excessive verdict for damages arising out of personal injuries was considered at length. We do not think anything can be added to the reasoning of the present Chief Justice in that case. The amounts of the verdicts in many cases in this and other courts, where the suffering and permanent disability resulting from the injury are more or less similar to that before us, are stated and commented on. After thoughtful consideration, we can but reach the conclusion there stated:

" 'Considering this record, the findings of the trial judge, the decisions of this and courts of last resort of our sister States, we are not persuaded that we should disturb this judgment.' ''

With reference to the injuries sustained by Mrs. Grinnell, it may also be said that there is no movement in the ankle joint on the left foot. There is a shortening of the foot and leg with some wasting of the leg. There is also some limitation to the movement of the right foot. There is a permanent injury to the left foot and leg compelling Mrs. Grinnell to use a cane when walking. In addition to scars on her face, Mrs. Grinnell suffered hemorrhage of both

eyes with a permanent injury to the retina of the
left eye. The trial court awarded Mrs. Grinnell
damages in the sum of $36,000. In considering the
damages so allowed, we have in mind that there was
no loss or expense to Mrs. Grinnell in the efforts
made to recover her health nor was there any loss
of earnings.

We next come to the question of damages for Mr.
Shepard. At the time of the trial he was 42 years of
age with an expectancy of approximately 26 years.
He suffered bruises and compound fracture of the
lower half of the leg and a partial displacement of
the ankle bone. He was in the hospital 11 weeks
and has made a good recovery with the exception of
some stiffness in the ankle. His expenses for medi-
cal care, hospitalization, nurses and special shoes
were approximately $2,500. The record does not
justify a finding that Mr. Shepard was employed in
a gainful occupation at the time of the explosion,
although the claim is made that he had a net income
from 1927 to 1930 of $12,000 per year and a net in-
come of $9,000 for the year 1931, although he paid
no income tax during these years.

Defendant company contends that if Shepard had
any claim or cause of action for the injuries sus-
tained by him, such claim or cause of action became
vested in the trustee in bankruptcy appointed to
administer Shepard's bankruptcy estate on the date
of the adjudication. The record shows that Shepard
was adjudicated and discharged in bankruptcy after
the explosion without having assigned his cause of
action to the trustee, while it is the claim of plaintiff
Shepard that tort claims do not pass to a trustee in
bankruptcy.

Section 70 of the Federal bankruptcy act (July 1,
1898, chap. 541, § 70, 30 Stat. at L. 565, 11 USCA,
§ 110) provides:

"The trustee of the estate of a bankrupt, upon his appointment and qualification, and his successors, if he shall have one or more, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt, as of the date he was adjudged a bankrupt, except in so far as it is to property which is exempt, to all * * * (5) property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him. * * * and (6) rights of action arising upon contracts or from the unlawful taking or detention of, or injury to, his property."

The general rule regarding the passage of tort claims to the trustee of the bankrupt is expressed in Remington on Bankruptcy (3d Ed.) § 1268, in the following words:

"Rights of action for slander, or libel or malicious prosecution, will not pass to the trustee, for they do not come under class 6 nor do they come under the general rule, namely, property which was capable of being transferred by the bankrupt. Such rights of action are not assignable nor can they be subjected by legal process. * * * Nor will a right of action for personal injury to the bankrupt, caused by a street car accident, pass to the trustee."

*In re Haensell*, 91 Fed. 355, the court said:

"A cause of action for damages arising out of a personal wrong suffered by the bankrupt is not embraced in the foregoing description of property, the title to which, by operation of law, vests in the trustee of the bankrupt. The right to sue for a personal tort, such as slander, malicious prosecution, assault, etc., is strictly personal. It cannot be assigned, is not subject to levy and sale upon judicial process, and the statute does not contemplate that the bankrupt's right to maintain an action to recover dam-

ages for such wrongs shall constitute any part of his estate in bankruptcy. The law follows, in this respect, section 14 of the bankruptcy act of 1867 (14 Stat. at L. chap. 176, p. 517), in the construction of which it was uniformly held that rights of action for personal torts did not vest in the assignee in bankruptcy. * * * The decisions under the bankruptcy laws of England are to the same effect, and section 70 of the present bankruptcy law of the United States, defining what property of the bankrupt shall vest in the trustee, is not more comprehensive than the act of 6 Geo. IV. chap. 16, § 63 (1825), which provided that all the real and personal estate of the bankrupt, and 'all the present and future personal estate of such bankrupt, wheresoever the same may be found or known,' should be assigned to the assignee of the bankrupt."

In *Sibley* v. *Nason*, 196 Mass. 125 (81 N. E. 887, 889, 12 L. R. A. [N. S.] 1173, 124 Am. St. Rep. 520, 12 Ann. Cas. 938), in a well-considered opinion, the court said:

"This action having been brought for damages to the person of the plaintiff, could not by any means have been transferred by him . * * * It was not property nor a right of property until it was reduced to a judgment. * * * Thus it appears that the claim which the plaintiff was prosecuting against the defendant is not properly described by any of the phraseology in subsection (5). Subsection (6) is limited to rights of action arising upon contract or respecting property and does not include an action of tort for personal injuries. It is not, and never has been, the policy of the law to coin into money for the profit of his creditors the bodily pain, mental anguish or outraged feelings of a bankrupt. None of the Federal or English bankruptcy acts, nor our own insolvency statutes, have gone to that length."

From the authorities above mentioned, we conclude that Shepard's cause of action did not pass to the trustee in bankruptcy.

Other errors have been assigned by defendant company, such as the burden of proof, admission of testimony, motion for a directed verdict and a motion for a new trial. We have carefully inquired into all of these claimed errors and find that the trial court correctly disposed of them.

The awards to Mr. Grinnell of $100,000, to Mrs. Grinnell of $36,000 and to Mr. Shepard of $12,500, are so excessive as to shock the judicial conscience.

While it is true that reported cases afford no fixed criterion of the subject of when damages are excessive, yet the books are filled with cases where damages for equally serious injuries have been reduced when they involved but a fraction of the damages awarded in these cases.

We think Mr. Grinnell's damages should be reduced to $72,500, which will award him, for pain and suffering, loss of earnings and earning capacity, the sum of approximately $50,000. Mrs. Grinnell's damages should be reduced to $20,000, and Mr. Shepard's to $9,000 and, unless remittiturs are filed to such effect, then new trials should be granted. If remittiturs are not filed within 20 days then the judgments should stand reversed, with new trials and, with costs to defendant. If remittiturs are filed then neither party should recover costs.

FEAD, C. J., and WIEST, BUTZEL, BUSHNELL, POTTER, and CHANDLER, JJ., concurred. NORTH, J., did not sit.