**KINGSLEY ASSOCIATES, INC.,**
Plaintiff–Appellant,
Cross–Appellee.

v.

**DEL–MET, INC., Defendant–Appellee,**
Cross–Appellant.

Nos. 89–1468, 89–1513.

United States Court of Appeals,
Sixth Circuit.

Cause Argued June 5, 1990.

Decided Nov. 20, 1990.

Rehearing Denied Dec. 21, 1990.

Grant J. Gruel (argued), Scott R. Melton, Gruel, Mills, Nims & Plyman, Grand Rapids, Mich., for plaintiff-appellant cross-appellee.

Michael J. O'Shaughnessy, Colombo & Colombo, Birmingham, Mich., Christopher G. Manolis, Deborah A. Hebert, Barbier & Tolleson, Detroit, Mich., Bernard P. Paige (argued), Troy, Mich., for defendant-appellee cross-appellant.

Before JONES and RYAN, Circuit Judges, and BROWN, Senior Circuit Judge.

RYAN, Circuit Judge.

This appeal and cross-appeal involve a dispute arising from a claim by a manufacturer's representative against its principal, an automotive parts manufacturer, for sales commissions. The representative, plaintiff Kingsley Associates, Inc., sued the defendant Del–Met, Inc. upon an alleged oral contract that provided that Kingsley would be paid commissions for all sales of any part Kingsley sold for Del–Met to the automobile industry for as long as the automobile industry customer reorders the part; that is, for "the life of the part." Del–Met, the parts manufacturer, refused to pay Kingsley commissions for orders filled both before and after the parties ended their relationship.

Del–Met counterclaimed that Kingsley was entitled to no outstanding commissions because, during the course of their relationship, Kingsley had simultaneously, and therefore disloyally, represented a competitor of Del–Met's and, thus, had compromised its services.

After a jury awarded Kingsley the commissions he sought, the district court granted a judgment notwithstanding the verdict ("j.n.o.v.") for Del–Met, setting aside the jury's verdict as to all post-termination commissions awarded but letting stand the jury's award of pre-termination commissions. Kingsley appealed and Del–Met cross-appealed. We are now asked to review the propriety of the district court's post-verdict judgment, and to examine a host of additional issues.

We conclude that the district court erred in granting the j.n.o.v. on the post-termination commissions, but correctly denied a j.n.o.v. with respect to the jury's award of pre-termination commissions. Therefore, for the reasons that follow, we shall reverse in part, and affirm in part, the district court's judgment, and remand the case for further proceedings.

I.

Kingsley is a manufacturer's representative. It acts as an agent for automobile parts manufacturers in sales to the automotive industry. In 1975, Kingsley began a business relationship with Del–Met, a manufacturer of metal wheel covers, wheel trim, and component wheel parts, by negotiating a licensing arrangement between Del–Met and Lacks Industries, a manufacturer of automotive plastics. By that agreement, Del–Met permitted Lacks to use Del–Met's patented retention system to manufacture plastic automotive wheel covers. At that time, Del–Met manufactured metal but not plastic wheel covers.

In 1979, Kingsley broadened its relationship with Del–Met. Through a "handshake" agreement between the respective company presidents, Kingsley became Del–Met's exclusive representative to the original equipment manufacturers ("OEM") market in southeastern Michigan. At that

time, the OEM market was comprised of the General Motors Corporation, the Ford Motor Company, Chrysler Motors, Inc., and the American Motors Corporation ("AMC"). It is not disputed that Del–Met knew that Kingsley simultaneously represented Lacks in a similar capacity.

Between 1979 and 1987, Del–Met's sales greatly increased; so much so that, in late 1986 or early 1987, Del–Met decided to expand its operations by manufacturing plastic wheel covers. Del–Met's plastic wheel cover facility began to operate sometime in 1987.

In the spring of 1987, a purchasing agent for the Chevrolet–Pontiac–Canada group at General Motors ("CPC"), who dealt with both Del–Met and Kingsley, notified Del–Met that Kingsley could no longer represent Del–Met and Lack simultaneously since the two were now competitors in the plastic wheel cover market. Another CPC employee told Kingsley to elect to represent either Del–Met or Lacks.

On April 7, 1987, Kingsley's president wrote to Del–Met's president informing him that Kingsley would be terminating its representation of Del–Met, at least with regard to plastic wheel covers.[1] Kingsley's president expressed his willingness to help Del–Met find a new agent for plastic wheel cover sales, but hoped Kingsley could continue to represent Del–Met with regard to metal products.

In May of 1987, Del–Met decided that, rather than have separate representatives for its metal and plastic products, it would retain one sales representative. On May 28, 1987, Del–Met's president wrote to Kingsley's president telling him that Del–Met was looking for a new representative. Expressing regret over the termination of their relationship, Del–Met's president requested that Kingsley continue to represent Del–Met until a new agent was found, and promised that Del–Met would "pay commissions at the agreed rates on all sales made through Kingsley up to the time that we obtain a new manufacturer's representative and advise you of that fact."[2]

Sometime in June of 1987, the Del–Met/Kingsley relationship was completely

1. In pertinent part, the letter by Kingsley's president read:

> My decision to go with Lacks Industries in the Plastic Wheel Cover area is based on the fact that I have six people who are dependent to a lesser, or larger degree of their income based on selling products for Lacks—not only wheel covers, but other significant dollar volume plastic product (grilles, headlamps, bezels, etc.).
>
> In order to assist you in whatever decision you will make, I will be happy to maintain sales support and our relationship in this product area until such time as you are able to line up a sales agent, or direct person for plastic wheel covers.
>
> We at Kingsley would very must like to continue to represent you with *metal* product at all areas of automotive—especially trim rings and all metal wheel covers, etc.

2. In pertinent part, the letter from Del–Met read:

> The decision forced upon you to separate your sales efforts with regard to metal and plastic products and to represent a competitor of Del–Met in the sale of plastic products, combined with these product changes, has placed me and my company in an extremely difficult position. Due to the direct competition that now takes place between plastic and metal products in our marketplace, it is im-

> perative that I have a single sales representative who will use every effort to sell both plastic and metal products in behalf of Del–Met. I have, therefore, reluctantly made the decision to terminate the relationship between Del–Met and Kingsley Associates with regard to metal products as you have with regard to plastic products rather than place you in the position of having a possible conflict of interest and having to choose between Del–Met's metal product and Lacks Industries plastic product in filling the needs of a particular customer.
>
> I will appreciate it if Kingsley Associates can continue to represent Del–Met as in the past until such time as I am able to find a new sales representative. I would also appreciate any recommendations you might make for such a representative.
>
> Although I feel the relationship of manufacturer and sales representative between our two companies must be terminated now, Del–Met will continue to cooperate in the completion of all existing orders obtained by Kingsley in behalf of Del–Met and will pay commissions at the agreed rates on all sales made until a new sales representative is obtained. Del–Met will continue to pay commissions at the agreed rates on all sales made through Kingsley up to the time that we obtain a new manufacturer's representative and advise you of that fact.

terminated when Del–Met hired one of Kingsley's salesmen as its new agent. Shortly thereafter, Del–Met stopped paying Kingsley commissions on new shipments of parts, notwithstanding that the parts had originally been sold to an OEM customer by Kingsley prior to the termination of the parties' relationship. Kingsley objected to discontinuance of the commissions and, on March 23, 1988, sued Del–Met in the United States District Court for the Eastern District of Michigan.

Kingsley claimed it was entitled to commissions for sales Del–Met consummated after April 7, 1987, the date of Kingsley's letter to Del–Met notifying Del–Met that the relationship must be terminated with respect to "customers and orders [it had originally] procured [for Del–Met]." Kingsley claimed that, by its oral agreement with Del–Met, it was to receive commissions on sales "for the life of the part," meaning it was entitled to commissions for sales of parts it had originally sold to OEM's for Del–Met for as long as the parts buyer continued to purchase the part.

Del–Met answered and filed a counterclaim alleging, after Kingsley's complaint was amended, that Kingsley had tortiously interfered with prospective Del–Met sales, had breached its contract with Del–Met, and had breached a fiduciary duty owed Del–Met. Del–Met based these allegations on Kingsley's alleged conflict of interest in representing Lacks while also representing Del–Met.

The dispute culminated in a jury trial, at which Del–Met twice moved for a directed verdict. The district court took the motions under advisement and submitted the case to the jury.

The jury returned a verdict in favor of Kingsley for $492,694 in post-April 7, 1987 commissions, less certain commissions applicable to plastic wheel cover part number 10091672, and for $166,240.99 in pre-April 7, 1987 commissions Del–Met had not paid Kingsley on certain AMC orders. The court then considered Del–Met's motion for a directed verdict, treating it as a motion for a j.n.o.v.

Two years later, the district court granted Del–Met's motion in part, and denied it in part. The court set aside the jury's award of post-April 7, 1987 commissions because it saw "no evidence in this case at all that there was any agreement between these parties for payment of commissions post-termination." But the court let stand the jury's pre-April 7, 1987 commissions award to Kingsley because it believed those pre-termination commissions were due under Kingsley and Del–Met's oral agreement.

Kingsley now appeals that portion of the district court's decision granting Del–Met a j.n.o.v. Del–Met cross-appeals that portion of the court's decision denying its directed verdict motion. The parties raise, and we shall address, a number of additional issues.

II.

"[A] federal court sitting in a diversity case must apply the forum state's standard for a directed verdict and a judgment notwithstanding the verdict since the federal rule governing both motions, Fed.R.Civ.P. 50(a), does not specify a standard." *Boynton v. TRW, Inc.,* 858 F.2d 1178, 1186 (6th Cir.1988) (citation omitted). In Michigan, whose law the parties agree is applicable, the standards for reviewing a trial court's decision regarding a motion for a directed verdict or a j.n.o.v. are identical. *See Bonelli v. Volkswagen of America, Inc.,* 166 Mich.App. 483, 514 n. 7, 421 N.W.2d 213, 227 n. 7 (1988) (citing *Matras v. Amoco Oil Co.,* 424 Mich. 675, 681–82, 385 N.W.2d 586, 588 (1986)).

In reviewing a trial court's failure to grant a defendant's motion for a directed verdict or a judgment notwithstanding the verdict, we examine the testimony and all legitimate inferences that may be drawn in the light most favorable to the plaintiff. If reasonable jurors could honestly have reached different conclusions, the motion should have been denied. If reasonable jurors could disagree, neither the trial court nor this Court has the authority to substitute its judgment for that of the jury.

*Matras,* 424 Mich. at 681–82, 385 N.W.2d at 588 (footnotes omitted).

In other words, "[a] JNOV may be granted only where there is insufficient evidence, as a matter of law, to make an issue for the jury." *Schanz v. New Hampshire Ins. Co.,* 165 Mich.App. 395, 401, 418 N.W.2d 478, 481 (1988) (citation omitted). "An appeals court in Michigan will not reverse the denial of a directed verdict motion 'if any competent and sufficient evidence supports the jury determination.'" *Rhea v. Massey–Ferguson, Inc.,* 767 F.2d 266, 269 (6th Cir.1985) (quoting *Kupkowski v. Avis Ford, Inc.,* 395 Mich. 155, 167, 235 N.W.2d 324, 331 (1975)).

█ Thus, in reviewing the district court's decision setting aside a portion of the jury's verdict, Michigan law requires that we determine whether the court correctly concluded that there was insufficient evidence, as a matter of law, to permit the jury to decide that portion of the case. In reviewing the district court's decision to deny in part Del–Met's motion for a j.n.o.v., we are required to decide whether any competent and sufficient evidence supported the jury's award to Kingsley.

### III.

█ Kingsley claims the district court erred in granting Del–Met a j.n.o.v. as to the post-April 7, 1987 commissions because there was sufficient evidence to permit the jury to determine that the oral agreement Kingsley had with Del–Met entitled Kingsley to post-termination commissions on sales it had procured prior to the termination of the relationship. We agree.

There was testimony at trial that the agreement between Kingsley and Del–Met called for Kingsley to receive commissions on sales it negotiated for Del–Met "for the life of the part." John O'Neill, the president of Kingsley in 1979 who negotiated the agency relation with Del–Met, described at trial his understanding of the agreement between Kingsley and Del–Met to be "in essence, . . . that we would represent Del–Met's Walton, New York plant to automotive on a handshake basis, and commissions were to be paid for the life of the part." Likewise, David Williston, director of sales and marketing at Del–Met between 1984 and 1986, testified at trial that he understood that Del–Met owed commissions to Kingsley "as long as the product or [for] the life of the part." Indeed, although not evidence, Del–Met's counsel conceded during his closing argument that the Del–Met/Kingsley agreement called for Del–Met to pay Kingsley commissions "for the life of the part."

The evidence to the contrary, according to Del–Met, is that when Kingsley's relationship with Del–Met began, Kingsley was paid commissions on sales it had not procured, and that neither Kingsley's president, John O'Neill, nor Del–Met's president, Herbert Buerger, could recollect any discussion between the parties concerning compensation for Kingsley after termination of the contract. Del–Met offered no evidence, however, contradicting the "life of the part" testimony by O'Neill and Williston.

The question for the jury, then, was whether the oral agreement between Kingsley and Del–Met, that commissions would be paid "for the life of the part," required Del–Met to pay commissions on sales of parts Kingsley had arranged on Del–Met's behalf prior to the termination of the relationship but which were consummated after the termination of the agreement. The district court told the jury it had to decide: "Was it the intention of the parties that Del–Met would pay commissions on sales on the life of the part even after the termination of the agreement?"

It was indeed for the jury to determine what Kingsley and Del–Met intended by agreeing that commissions would be due "for the life of the part."

> "[W]here the terms of a negotiation are left to oral proofs, the question what the parties said and did, and what they intended should be understood thereby, is single and cannot be separated so as to refer one part to the jury and another part to the judge; but in its entirety the question is one of fact."

*McKenzie v. Sykes,* 47 Mich. 294, 295–96, 11 N.W. 164, 165 (1882), *quoted in Guilmet v. Campbell,* 385 Mich. 57, 68, 188 N.W.2d 601, 606 (1971). We think the jury was entitled to determine, based upon the evidence, that by agreeing to pay commissions "for the life of the part," Del–Met intended to pay Kingsley commissions on sales it had procured even if those sales were not consummated until after the termination of the Kingsley/Del–Met agency relationship.

Moreover, there was no evidence to support the inference that the parties understood that commissions paid "for the life of the part" could not be paid beyond the existence of the relationship. In a July 14, 1987 letter, Michael Buerger, then-president of Del–Met and son of the late Herbert Buerger, the Del–Met president with whom John O'Neill entered the "handshake" agreement in 1979, wrote to Kingsley:

> I recognize that Kingsley may be entitled to some compensation on orders placed by our customers under existing one-year contracts. Upon the expiration of each of these one-year requirement contracts not in effect, all obligations by Del–Met to Kingsley in connection with those contracts will terminate.
>
> Del–Met has no further obligation to Kingsley with regard to contracts or orders for any plastic parts or wheel covers after April 7, 1987, the date of your notice of termination.
>
> As soon as we reach an agreement on compensation to be paid on the parts sold under existing contracts until their regular expirations, Del–Met will begin making commission payments. We will wait to hear from you before taking any further actions.

This letter indicates that Del–Met understood it might owe Kingsley commissions *after* the termination of the relationship due to the nature of the agreement Kingsley had with Del–Met. While the letter also supports the inference that Kingsley would be entitled to commissions only for one year after Del–Met entered an agreement with an OEM, it was competent evidence upon which the jury could base a determination that the oral agreement Kingsley had with Del–Met was understood to entitle Kingsley to certain post-termination commissions. This, combined with the evidence establishing that commissions were to be paid "for the life of the part," was sufficient to support the jury's determination that Kingsley was entitled to post-April 7, 1987 commissions.

Moreover, the jury's interpretation of Del–Met's agreement to pay Kingsley commissions "for the life of the part" was consistent with Michigan law. In Michigan, a sales representative "is entitled to recover his commission whether or not he has personally concluded and completed the sale, it being sufficient if his efforts were the procuring cause of the sale." *Reed v. Kurdziel,* 352 Mich. 287, 294, 89 N.W.2d 479, 483 (1958) (citations omitted). *See also Titchenal v. Jackson & Church Co.,* 375 Mich. 281, 282, 134 N.W.2d 224 (1965); *Shortt v. Centri–Spray Corp.,* 369 Mich. 303, 308, 119 N.W.2d 528, 530 (1963); *Militzer v. Kal–Die Casting Corp.,* 41 Mich. App. 492, 495, 200 N.W.2d 323, 325 (1972).

Application of the "procuring cause" doctrine depends on a determination of the intentions of the parties to the agency relation.

> "The relationship between agent or broker and principal being a contractual one, it is immediately apparent that whether an agent or broker employed to sell personalty on commission is entitled to commissions on sales made or consummated by his principal or by another agent depends upon the intention of the parties and the interpretation of the contract of employment, and that, as in other cases involving interpretations, all the circumstances must be considered."

*Reed,* 352 Mich. at 294, 89 N.W.2d at 482–83 (quoting Annotation, *Right of Agent or Broker, Employed to Sell Personalty on Commission, to Commissions on Sale Made or Consummated by his Principal or Another Agent,* 12 A.L.R.2d 1360, 1363 (1950)).

Since the evidence supported a jury determination that Kingsley and Del–Met in-

tended commissions to be paid "for the life of the part" and suggested that Del–Met understood it had *some* post-termination obligations to Kingsley, the jury was justified in concluding that Del–Met owed Kingsley commissions for sales it had procured but which were not consummated until after the date of the termination of the relationship.

For these reasons, we hold that the district court erred in granting Del–Met a j.n.o.v. precluding Kingsley from recovering post-April 7, 1987 commissions as a matter of law.

## IV.

■ In its cross-appeal, Del–Met argues that the district court erred in denying its motion for a j.n.o.v. regarding pre-termination commissions. Del–Met claims that Kingsley is entitled to no commissions under Michigan law because it was guilty of a conflict of interest in simultaneously representing Del–Met and Lacks. We assume Del–Met's argument applies to Kingsley's claim for the post-termination commissions we have found the jury was justified in awarding, as well as the pre-termination commissions.[3]

We reject Del–Met's argument as to both the pre- and post-termination commissions because competent and sufficient evidence supported the jury's determination that Kingsley was not precluded from the commissions by virtue of any alleged divided loyalty.

In Michigan:

The general rule is that a broker may forfeit his right to compensation by misconduct, breach of duty, or wilful disregard, in a material respect, of an obligation imposed upon him by the law of agency. A corollary of this rule is that "the law will not permit an agent to act in a dual capacity in which his interest

conflicts with his duty, without a full disclosure of the facts to his principal." *Sweeney & Moore, Inc. v. Chapman,* 295 Mich. 360, 363, 294 N.W. 711, 712–13 (1940) (quoting *Hogle v. Meyering,* 161 Mich. 472, 126 N.W. 1063 (1910) (syllabus)). *Accord Hogle,* 161 Mich. at 484–85, 126 N.W. 1063, 1068.

In *Sweeney & Moore,* a buyer of real estate was sued by his broker after refusing to pay the broker for services rendered on a sale. The buyer refused to pay the broker, in part, because the broker had allegedly entered into an agreement with the seller's broker to split commissions on the sale. The trial court declined to submit the question of the propriety of the alleged commission splitting agreement to the jury, and the jury awarded the broker the commission. *Sweeney v. Moore,* 295 Mich. at 365, 294 N.W. at 712. On review, the Michigan Supreme Court reversed the judgment, holding that commission splitting agreements are invalid in Michigan. *Id.* at 364, 294 N.W. at 714.

By its decision in *Sweeney & Moore,* the Michigan Supreme Court included commission splitting agreements between agents of principals on opposite sides of a transaction to be among " 'those contracts which are "opposed to open, upright, and fair dealing, and therefore opposed to public policy." ' " *Id.,* 294 N.W. at 713 (quoting *Humphrey v. Eddy Transp. Co.,* 107 Mich. 163, 167, 65 N.W. 13, 14 (1895)). The court noted that, for such agreements, " '[i]t is immaterial that the plaintiff acted in good faith, or that the defendant suffered no damage. It is the policy of the law to remove all temptation in an agent to be influenced by his own interest to the detriment of his principal.' " *Id.* (quoting *Humphrey,* 107 Mich. at 167, 65 N.W. at 14). *Accord Greater Bloomfield Real Estate Co. v. Braun,* 64 Mich.App. 128, 137, 235 N.W.2d 168, 173 (1975).

---

3. The district court did not address this argument in the course of ruling on Del–Met's motion for a directed verdict because it had concluded that Kingsley was entitled to no post-termination commissions under the terms of the Kingsley/Del–Met agreement. Because we must reverse the court's decision on that issue, holding that the jury could award Kingsley post-termination commissions, we reopen the question of the propriety of the jury's rejection of Del–Met's "dual agency" defense. We address this question, without benefit of a district court's decision, because the record provides an adequate basis for our review.

Del–Met relies on the rule of *Sweeney & Moore* to support its argument that Kingsley is entitled to none of the commissions claimed because Kingsley's loyalty was divided throughout the course of the Kingsley/Del–Met relation. We think, however, that the conflict involved in *Sweeney & Moore* is readily distinguishable from that which Del–Met attributes to Kingsley.

Rather than suggesting that Kingsley had an interest in both sides of a transaction involving Del–Met, Del–Met argues that Kingsley's loyalty to one of its competitors, namely Lacks, tempted Kingsley to compromise its services to Del–Met. This distinction is significant.

The Restatement (Second) of Agency § 394 (1958) provides:

Unless otherwise agreed, an agent is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed.

The Restatement authors explain that this provision imposes specific requirements on agents in situations other than those "in which the agent acts for an adverse party in a transaction to which the principal is a party." Restatement (Second) of Agency § 394 comment a (1958). By noting that "an agent has a duty not to act for a competitor of his principal unless this is permitted by the understanding of the parties," the authors implicitly recognize that an agent's dual representation of competitors is not necessarily among " 'those contracts which are "opposed to open, upright, and fair dealing, and therefore opposed to public policy." ' " *Sweeney & Moore* 295 Mich. at 364, 294 N.W. at 713.

In comment b to section 394, the Restatement authors explain further:

The agent commits no breach of duty by acting for competitors if, at the time of his employment, the principals have reason to know that the agent believes that he is privileged to do so. However, in obtaining consent of the principals to such competition, the agent is subject to the duty of disclosure stated in Section 392.[4]

In many cases the circumstances indicate an understanding that the agent is entitled to act for principals whose interests conflict, although none of them know that he is so acting or that he intends to do so. The constituents of a factor or a broker are normally competing with each other in the sale of goods. That one is the exclusive selling agent of his principal does not necessarily preclude him from acting for others. In the absence of a conclusive custom or a course of dealings, all facts of the situation are considered in determining the mutual understanding. It is much easier to find that an agent is privileged to act for a competitor than to find that an agent is privileged to act for an adverse party, since acting for a competitor has merely a tendency to reduce the diligence of the agent and not, as where the agent is acting for an adverse party, to cause him to give improper advice or to take improper action. Ordinarily, if the agent can properly act on his own account in competition with the principal (see § 393), he is entitled to act for others.

Restatement (Second) of Agency § 394 comment b (1958). The authors then provide a helpful example:

P, a manufacturing company, enters into a contract with A, another corporation, the business of which is representing manufacturers. By the terms of the contract A is to have the exclusive agency to sell P's products. A makes other similar contracts with competing manufacturers. In the absence of further facts, A thereby commits no breach of duty to P.

---

**4.** Section 392 provides:

An agent who, to the knowledge of two principals, acts for both of them in a transaction between them, has a duty to act with fairness to each and to disclose to each all facts which he knows or should know would reasonably affect the judgment of each in permitting such dual agency, except as to a principal who has manifested that he knows such facts or does not care to know them.

Restatement (Second) of Agency § 392 (1958). *Accord Gardner v. Michigan Employers' Casualty Co.*, 214 Mich. 692, 697–98, 183 N.W. 738, 740 (1921).

Restatement (Second) of Agency § 394 comment b, illustration 1 (1958).

We believe the facts in this case, as developed in the record before us, are precisely those of the illustration and that the jury was entitled to reject Del–Met's defense alleging Kingsley's breach of a fiduciary duty.

The evidence established that Del–Met, a manufacturer of metal wheel covers, enlisted Kingsley as its industry representative in 1979 knowing that Kingsley also represented Lacks, a manufacturer of plastic wheel covers. Del–Met entered the plastic wheel cover market in 1987 without expressing any concern about its continued relationship with Kingsley. Kingsley, albeit after being warned of its potential conflict by a third party, formally notified Del–Met of its inability to continue to represent Del–Met with regard to plastic wheel covers on April 7, 1987; and, in its May 28, 1987, response to Kingsley's letter, Del–Met expressed a willingness to continue to rely on Kingsley's representation until it found a new agent.

Del–Met points to no evidence suggesting that it was denied contracts or suffered in any way from Kingsley's representation of Lacks throughout the years of their relation.

We hold, therefore, that Del–Met was not entitled to a j.n.o.v. on the ground that Kingsley was precluded, as a matter of law, from claiming any pre- or post-termination commissions due to Kingsley's alleged conflict of interest in representing both Del–Met and Lacks.

## V.

Kingsley and Del–Met raise a number of additional issues in their appeal and cross-appeal. Because of our decision to reverse the district court's j.n.o.v. regarding the post-April 7, 1987 commissions, we need not address two of the errors Kingsley assigns.[5] We address the remaining issues *seriatim.*

### A. *Damages: Projected Sales Evidence*

Kingsley claims the district court erred in limiting the evidence it could introduce at trial regarding projected sales of Del–Met's parts to those sales consummated prior to January of 1989. Kingsley wished to prove that it was entitled to commissions for sales of certain parts that would be used on various car models for three to ten years after the initial sale of the part and, therefore, long after the termination of Kingsley relationship with Del–Met. To that end it wished to call as a witness Robert Zimmerman, whom counsel for Kingsley intended to qualify as an expert, to testify based upon his research and specialized familiarity with the automobile industry, that certain Del–Met parts originally sold to automobile manufacturers by Kingsley would be reordered by manufacturers and used in future car models for a number of years. Before trial, counsel for Del–Met moved, *in limine,* to preclude Zimmerman from so testifying on the ground that he was not qualified to express an opinion on the matter. Without hearing any testimony concerning Zimmerman's asserted expertise, the district court categorically excluded any opinion testimony declaring:

> *The Court:* I'm only suggesting to you that if you are going to ask him what is General Motors going to do with this particular part up until 1993, I'll sustain any objection to it. He is not an expert and if he's an accountant, he surely is not an expert on that subject.
>
> . . . .
>
> *The Court:* General Motors doesn't know what it's going to do in 1989 [*sic* 1993?].
>
> [*Plaintiff's Counsel* ]: Well, I disagree with that, your Honor. Part of the basis on which he will testify are confidential General Motors documents in that respect.
>
> *The Court:* They're all hearsay and he should not base an expert opinion on an opinion in hearsay evidence.

---

5. Kingsley argues that the district court erred in failing to adequately instruct the jury as to the "procuring cause" doctrine and that the court

erred in excluding, on hearsay grounds, an alleged Del–Met admission.

Thus, Kingsley was precluded from offering evidence for the purpose of proving, through Zimmerman's opinion, that parts it originally sold to the automobile industry on Del–Met's behalf would be reordered and used for a period of three to ten years after the original sale.

We think the court was mistaken in its ruling in two respects: its basis for excluding Zimmerman's proposed expert opinion testimony, and its conclusion that an expert's opinion may not be based upon hearsay.

■ The court's categorical exclusion of Zimmerman's proposed opinion testimony, without hearing any evidence concerning Zimmerman's expertise or his basis for expressing an opinion, can only be based upon the court's personal understanding of the business operation of the automobile industry and not any evidence in the record. While a proposed expert witness' qualification to testify "in the form of an opinion or otherwise," Fed.R.Evid. 702, is unquestionably a preliminary factual determination for the trial court, Fed.R.Evid. 104(a), it is a determination which must be made upon the evidence of the witness's qualifications, or lack thereof, and not upon the trial court's personal views. When determining the competence of a witness to render an expert opinion,

> the trial judge should not rely on labels, but must investigate the competence a particular proffered witness would bring to bear on the issues, and whether it would aid the trier of fact in reaching its decision.

*Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir.1981). Had the court received some evidence concerning Zimmerman's credentials to express the opinion he was prepared to offer as to the history, custom, and practice in the automobile industry concerning the duration of the use of wheel covers and trim parts and the business practices of the industry concerning projected purchasing practices, the court might have concluded that the opinion Zim-

merman was prepared to offer was entirely sound and that, indeed, General Motors did "know what it's going to do" several years in the future. Such an opinion, if admissible, might have assisted the jury to decide the amount of commissions to which Kingsley was entitled as the result of its "for the life of the part" agreement with Del–Met; an interpretation which we previously held was within the jury's purview. Such testimony would have permitted the jury to calculate precisely the damages to which Kingsley was entitled based on the terms of the agreement rather than limiting Del–Met's liability to a court-selected cutoff date of January 1989. On the other hand, Zimmerman's preliminary Rule 104(a) testimony on those subjects may have confirmed the court's personal opinion that neither Zimmerman nor any other person would be qualified to testify as an expert as to what "General Motors is going to do" in the future. It is clear, however, that there was no evidence whatever received on the subject and that the court's ruling that Zimmerman was not an expert was made entirely on the court's personal impression of the manner in which the automobile industry functions; a *sua sponte* finding unsupported by any evidence that the proposition the plaintiff wished to prove was unprovable through opinion testimony. In that, the district court was in error.

■ The court was also in error in its observation that Zimmerman's opinion testimony would be inadmissible because it would be based on hearsay evidence.[6] Although it once was the rule of evidence in federal courts that expert opinion testimony could not be based on inadmissible hearsay, that is no longer the law nor has it been since the adoption of the Federal Rules of Evidence in 1975.

Federal Rule of Evidence 703 provides: The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by *or made known to the expert at or before*

---

**6.** Although this issue was not raised on appeal, we address it because of the likelihood that it

may reoccur on rehearing.

*the hearing.* If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data *need not be admissible in evidence.*

(Emphasis added.)

Because such "facts or data need not be admissible in evidence," they may include hearsay.

We addressed this issue in *Mannino, supra:*

It is clear that there was an adequate basis for his opinion within the meaning of Rule 703. He relied upon studies, his own experience in dynamic testing, his background as a bio-mechanical engineer, and upon literature and information furnished him by plaintiff's attorney. *The fact that much of this was hearsay which would probably not be admitted into evidence has nothing to do with the case.* The question is whether it is the type of material that an expert would rely upon, and there is no showing in this record that it is not. In fact, it was the type of material that expert witnesses often rely upon in forming opinions.

*Id.* at 853 (footnote omitted) (emphasis added).

We conclude that the district court must conduct new proceedings on the issue of damages in order to afford Kingsley the opportunity to prove, if it can, the amount of post-April 7, 1987 commissions, if any, to which Kingsley is entitled by virtue of its "for the life of the part" agreement with Del–Met. Such commissions may, of course, be based only on specific sales consummated after the termination of the Kingsley/Del–Met relation which Kingsley actually negotiated on Del–Met's behalf.

## B. *Jury Instructions*

Del–Met argues, in its cross-appeal, that the district court erred in failing to instruct the jury, according to its request, regarding Kingsley's alleged conflict of interest, and also that the court gave an erroneous instruction regarding the calculation of damages. For the following reasons, we reject both arguments.

### 1. *The Conflict Instruction*

"To effectively charge a trial court with failure to provide an instruction, one must first show the presence of evidence in the record sufficient to support submission of that instruction." *Bucyrus–Erie Co. v. Gen. Products Corp.,* 643 F.2d 413, 420 (6th Cir.1981) (citations omitted).

The proposed instruction Del–Met claims the district court should have given is:

It is the law of the State of Michigan that an agent, in this case Plaintiff KINGSLEY, has a fiduciary obligation and is required to act in the principal's best interests in all matters relating to the business of the principal in this case Defendant DEL–MET. The loyalty of an agent to a principal must be absolutely undivided.

An agent can be denied its right to compensation if the agent's actions presented the temptation to sacrifice the interests of the principal. It is not necessary for the principal to show actual injury to itself.

Defendant DEL–MET claims that KINGSLEY, as its agent, acted adversely to DEL–MET's best interests. If you determine that Defendant DEL–MET has met its burden of proof as to Plaintiff KINGSLEY's sacrifice of DEL–MET's interests, you may deny compensation to the agent, KINGSLEY.

As previously noted in our discussion of Del–Met's claim that Kingsley was guilty of a conflict of interest in representing both Del–Met and Lacks, Del–Met failed to offer *any* evidence that Kingsley had compromised its services to Del–Met during the course of their relationship. Consequently, Del–Met was not entitled to the proposed instruction the district court declined to give.

But, even assuming arguendo that there is sufficient evidence in the record to justify Del–Met's requested instruction, we believe the instructions the district court gave sufficed to submit the conflict of interest issue to the jury.

The district court twice referred to Del–Met's "dual agency" defense. The first

time, in summarizing the facts, the court said:

> Del–Met further claims, members of the jury, that it has no obligation to pay any additional commissions to Kingsley because Kingsley breached its duty of trust or fiduciary responsibility to Del–Met by engaging in a conflict of interest in self dealing as between Del–Met and Del–Met's competitors which caused the termination of the agreement.

The second time, in instructing the jury as to the law in the case, the court said:

> The relationship between Defendant Del–Met and Plaintiff Kingsley is that of principal and agent, members of the jury, with Kingsley acting as agent to its principal, Del–Met. An agent is one who acts in behalf of another, particularly with regard to the conduct of business transactions. The relationship between principal and agent is fiduciary in nature and carries with it certain obligations of trust and faith and loyalty and fair dealing.

Although these instructions were not in the language Del–Met requested, we believe they were essentially the same and adequately stated the law upon which Del–Met relies. We, therefore, reject Del–Met's argument regarding the conflict instruction.

### 2. The Damages Instruction

■ Del–Met claims the district court erred in failing to instruct the jury that the only post-termination damages Kingsley could be entitled to, if any, were gross commissions Kingsley did not receive less expenses it would have incurred but for the termination of the relation. Del–Met claims the court also erred in not instructing the jury that Kingsley had the burden of proving both its entitlement to future commissions and the absence of expenses. In support of its argument, Del–Met cites *Shapiro v. Fyrac Mfg. Co.*, 264 Mich. 280, 281, 249 N.W. 851 (1933); *Om–El Export Co., Inc. v. Newcor, Inc.*, 154 Mich.App. 471, 478, 398 N.W.2d 440, 444 (1986); and *Lawton v. Gorman Furniture Corp.*, 90 Mich.App. 258, 267, 282 N.W.2d 797, 801 (1979).

*Shapiro, Om–El Export,* and *Lawton* were all breach of contract actions in which the victims of a breach sought damages for loss of future earnings. Accordingly, the appropriate measure of damages for the lost profits in each case was "gross commissions less expenses that would have been incurred but for the breach." *Om–El Export,* 154 Mich.App. at 478, 398 N.W.2d at 444 (citations omitted). "Any other rule would obviously grant the offended litigant a greater sum than he would have earned had the breach not occurred." *Lawton,* 90 Mich.App. at 267, 282 N.W.2d at 801.

This case, however, is not a breach of contract action for lost future earnings. Kingsley did not seek future profits it would have received but for the termination of its relationship with Del–Met. The theory of Kingsley's case was that Del–Met withheld commissions on parts sales Kingsley had earned prior to the termination of the relationship. Kingsley had already incurred expenses associated with procuring those sales. It merely sought commissions on the sales according to the terms of its agreement, that is, "for the life of the part."

Therefore, we conclude that the district court was correct in instructing the jury that, if it found Del–Met liable, "[t]he damages in this case are the commissions that [Kingsley] claims it's entitled to," that is, "commissions on sales obtained on behalf of Defendant Del–Met where the plaintiff Kingsley was the procuring cause of those sales." The district court did not err in its instruction on damages.

### C. Damages

■ As part of its cross-appeal, and in conjunction with its preceding argument, Del–Met claims that it was entitled to a j.n.o.v. because Kingsley failed to submit evidence regarding its net profit and expenses. Del–Met bases this argument on its theory that Kingsley could only be entitled to gross commissions less unincurred expenses. For the reasons discussed above, we reject Del–Met's theory of dam-

ages. Moreover, we note that Kingsley supported its claim for damages with sufficient and competent evidence upon which the jury could base its award.

Don Flood, one of Kingsley's salesmen, testified as to a mistake Del–Met had made in failing to pay Kingsley commissions of some $166,240.99 for a sale of certain parts to AMC between 1982 and 1984. Flood's evidence supports the jury's award of those pre-termination commissions to Kingsley.

Robert Zimmerman prepared exhibits and testified regarding calculations he made of commissions Del–Met owed Kingsley between April of 1987 and January of 1989 totalling $492,694. The jury could base its post-termination commissions award, less certain commissions applicable to a particular plastic wheel cover part, on this evidence.

## VI.

For the foregoing reasons, the judgment of the district court granting the judgment notwithstanding the verdict is VACATED, and the verdict of the jury is ordered reinstated. In addition, the case is REMANDED to the district court for a limited new trial upon the plaintiff's claim for commissions earned after January 1989, upon sales plaintiff may have procured for defendant prior to April 7, 1987.