36 F.3d 1097
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joon S. MOON and Carl Zies, Plaintiffs-Appellees,
v.
HYOSUNG (AMERICA), INC., Defendant-Appellant.
 No. 92-2064.
 United States Court of Appeals, Sixth Circuit.
 Sept. 28, 1994.
 
 Before: GUY and NELSON, Circuit Judges, and HOOD, District Judge*
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 After the defendant company terminated an agency agreement with the plaintiff sales representatives, the latter brought suit for breach of contract, retaliatory discharge, and interference with advantageous business relationships. A jury returned a verdict for the plaintiffs on the breach of contract claim, and the plaintiffs were awarded a total of $4 million in compensatory damages. We are asked to decide whether the jury's verdict was tainted by passion and prejudice; whether the verdict was against the manifest weight of the evidence with respect to liability, damages, or both; and whether the plaintiffs' claim for future commissions was ripe. For the reasons stated below, we shall affirm the judgment as to liability and remand the case for a new trial as to damages.
 
 
 2
 * Plaintiff Joon S. Moon, a native of Korea, came to the United States in 1959 to study chemical engineering. Now a naturalized citizen of this country, he returns annually to Korea to visit family members. Since 1970 it has been Dr. Moon's custom to call each year on Sung Nae Cho, a high school classmate who is chairman of the board of the largest corporation in the Hyosung Group, a Korean business combination with annual revenues of some $4 billion.
 
 
 3
 In 1985, during a dinner in Korea, Dr. Moon and Sung Nae Cho agreed that Moon would begin soliciting sales in the American midwest for the group's U.S. affiliate, defendant Hyosung (America), Inc. (hereinafter "Hyosung"). The then-president of the affiliate memorialized the agreement in a letter to Dr. Moon dated November 27, 1985:
 
 
 4
 "We appreciate your cooperation in the various field of business. Our mutual endeavors will result in benefits for both of our companies in the very near future.
 
 
 5
 We are pleased to quote the price adding five (5) percent to our cost as your commission for any inquiry instigated by your company.
 
 
 6
 Thank you for your interest in our company and its products."
 
 
 7
 Soon after securing this agency relationship, Moon approached Carl Zies, his co-plaintiff in this action, about working on behalf of Hyosung. Mr. Zies was interested, and he and Moon agreed to an equal split of commissions paid under the agreement. Moon and Zies informed Hyosung of this arrangement.
 
 
 8
 Moon and Zies were successful in soliciting business from several companies, but the bulk of the dollar volume they generated came from a contract with a company called BMY. That corporation had a large contract to build trucks for the United States armed services, and Hyosung signed a five-year agreement to provide components for the trucks. The contract produced about $30 million in revenues for Hyosung. Moon and Zies were paid approximately $1.6 million in commissions over a four and a half year period.
 
 
 9
 In February of 1990 Mr. Zies notified Hyosung that some of the winches it was shipping to BMY pursuant to the truck contract were defective. Hyosung's new president proposed changes to the agency agreement in April of 1990. Through counsel, Moon and Zies responded that any attempted unilateral change would violate the agreement. By letter of May 17, 1990, Hyosung informed the plaintiffs that the company would terminate the agreement effective June 16, 1990, but would continue to pay commissions on the BMY contract ending in June of 1991.
 
 
 10
 BMY and Hyosung entered into a second contract in March of 1991. This contract generated approximately $9 million in sales for Hyosung. The company did not pay the plaintiffs any commissions on sales under the second contract.
 
 
 11
 The plaintiffs brought suit against Hyosung in a Michigan state court, alleging breach of contract, retaliatory discharge, and interference with advantageous business relationships. Hyosung removed the case to federal district court on diversity grounds. The district court denied a motion by Hyosung for summary judgment, concluding that the parties' agreement was ambiguous with respect to post-termination commissions.
 
 
 12
 After a two-week trial, which Hyosung now claims was flawed by a number of xenophobic statements by counsel for the plaintiffs, the jury rendered a verdict in favor of the defendant on the retaliation claim and in favor of the plaintiffs on the breach of contract claim. (The district court directed a verdict in the defendant's favor on the claim that Hyosung interfered with the plaintiffs' business relationships.) The jury determined that each plaintiff was entitled to $2 million in compensatory damages, and the court entered judgment on the verdict. Motions to vacate and for a new trial or remittitur were denied, and this appeal followed.
 
 II
 
 13
 An appellate court's power to set aside a judgment entered on a verdict allegedly tainted by misconduct of counsel should be exercised very sparingly, since the court reviews only the cold record of the trial and does not have the trial court's ability to gauge the impact that counsel's comments may have had on the jury. City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749 (6th Cir.1980). The judgment should not be set aside unless there is a "reasonable probability" that the jury has been influenced by extraneous matters. Id. at 756.
 
 
 14
 "In determining whether 'there is a reasonable probability that the verdict of a jury has been influenced' by improper conduct, warranting that the verdict be set aside, a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself." Id.
 
 
 15
 Hyosung points to comments made by the plaintiffs' lawyer during his opening statement and closing argument, and, to a lesser degree, to testimony elicited during the plaintiffs' case in chief, as indicating that counsel was appealing to passion and prejudice. Hyosung takes exception most strongly to comments it interprets as playing on prejudices against Koreans, but the company also expresses concern about comparisons between it and General Motors or Chrysler, comments likening Sung Nae Cho to Robert Stempel or Lee Iacocca, and comments to the effect that "they"--either Koreans generally or Hyosung in particular--do not believe in living up to their contracts.
 
 
 16
 Looking to the totality of the circumstances, as Kiewit directs, we are convinced that there is no reasonable probability that the jury's verdict in this case was influenced by any improper conduct on the part of the plaintiffs' counsel. Many of the comments Hyosung now finds objectionable were clearly relevant to the plaintiffs' claims that the company interfered with advantageous business relationships. For example, plaintiffs' counsel said this during his opening statement:
 
 
 17
 "And, thirdly, we contend that they breached their contract with us to move their own people, their own Korean Nationals[,] into the position to control the marketplace and to get rid of American citizen[s]. And I intend to produce the evidence with regard to that. And I want you to understand that by that, there will not be any evidence that we will produce for you to tell you anything other than it is their right, this corporation's right to do business in this country. That's what this democratic system is all about. They have as much right as any of us. We welcome that business, but when they come into our arena or we go into their's [sic], we play by the rules of the country that we're in, and we will show you that in this country as you will learn from the Court's instructions as well that there are rules about contract and there are rules that we're entitled to with regard to contract.
 
 
 18
 "There are things that people have obligations to do and contracting parties have obligations to do. We cannot discriminate against Americans. We cannot discriminate against Koreans or any other nationality."
 
 
 19
 The plaintiffs attempted to prove their interference-with-business-relationships claim in much the way their counsel suggested they would in the passage above. They introduced deposition testimony of a former controller for Hyosung who testified that the company discriminated against Americans and in favor of its Korean employees. The plaintiffs were entitled to try to prove that Hyosung was trying to phase them out in favor of Korean nationals in a discriminatory fashion.
 
 
 20
 Similarly, the plaintiffs' opening statement alluded to anticipated evidence regarding the claim that Hyosung terminated the plaintiffs' agency contract because Zies insisted the company inform BMY of the defective winches Hyosung was supplying:
 
 
 21
 "The testimony will reveal that BMY was a company that was in the process of bidding to manufacturer [sic] for the United States Government defense department a five-ton military truck vehicle[,] and this vehicle, so that you'll know, was going to be used by the military.
 
 
 22
 "And one of its functions, it had, on the front of the truck, there were two winches, on the rear of the truck there were two winches. The winches would be used for various things, one of, if you were in a combat situation and a tank got stuck and you had to get somebody either in the Gulf War out of the sand or whatever, that the winch would be able, through this five-ton truck, would assist in doing that so that you could escape so that your soldiers wouldn't be injured and whatever. And that was basically one of the purposes of this truck."
 
 
 23
 In Hyosung's view, the above-quoted passage served only to inflame the jury. We disagree. In trying to prove their charge of retaliatory termination, the plaintiffs were entitled to explain both why Zies might have insisted the company inform BMY of the winch defects and why Hyosung might retaliate for Zies's actions.
 
 
 24
 Kiewit teaches that in examining the totality of the circumstances, the appellate court should consider "the manner in which the parties and the court treated the comments...." 624 F.2d at 756. Hyosung's trial counsel failed to make any contemporaneous objection to most of the comments the company now labels prejudicial and inflammatory. Contrast this with Kiewit, 624 F.2d at 758 ("The remarks were persistently made over the recurring and almost constant objection of counsel for the appellant") (internal quotation omitted).
 
 
 25
 The comments now being challenged represented only a tiny part of what the jury heard in this lengthy trial. We are satisfied that most of the statements in question were not plainly objectionable, and that nothing was said that requires a new trial.
 
 III
 
 26
 Hyosung never moved for a directed verdict on the plaintiffs' breach of contract claim. Neither did the company object to the district court's instruction to the jury regarding that claim:
 
 
 27
 "The issue for you to decide is whether the contract between the parties was one whereby defendant agreed to pay plaintiffs commissions on sales made to customers that plaintiffs introduced to the defendant, but which sales occurred after the plaintiffs were terminated. The parties' contract is set forth in the November 27, 1985 letter from the defendant, to Plaintiff Moon. That's been marked as Exhibit 1. Your job is to determine whether this contract represents an agreement by defendant to pay commissions on sales made after plaintiffs' termination."
 
 
 28
 Following the verdict in plaintiffs' favor on that claim, Hyosung filed a motion to vacate the judgment and a motion for a new trial or remittitur. In both motions it was contended that the jury's verdict was erroneous as a matter of law and fact.
 
 
 29
 Because Hyosung did not move for a directed verdict at trial, the company is foreclosed from contesting the sufficiency of the evidence. TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 545-46 (6th Cir.1981). An appellant who has not moved for a directed verdict may still argue, however, that the district court should have granted a new trial because the jury's verdict was against the clear weight of the evidence. Id. at 546. Hyosung apparently intends to make such an argument,[1] although it has pointed to no evidence in the record, other than the somewhat laconic language of the contract itself, as supporting its view of what the contract meant.
 
 
 30
 The district court's denial of a motion for a new trial must be upheld on appeal unless we are persuaded that it represented an abuse of discretion. J.C. Wyckoff & Associates v. Standard Fire Insurance Co., 936 F.2d 1474, 1487 (6th Cir.1991).
 
 
 31
 "[I]n ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence. It should deny the motion if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." Id. (citation omitted).
 
 
 32
 To be entitled to post-termination commissions for every sale Hyosung consummated with a referred client, the plaintiffs had to establish in the trial court that it was the parties' intention when they entered the agency agreement to pay such post-termination commissions. See, for example, Kingsley Associates, Inc. v. Del-Met, Inc., 918 F.2d 1277, 1281-82 (6th Cir.1990), applying Michigan law and holding that evidence supported the jury's verdict that the parties intended commissions to be paid for the "life of the part," and Andries v. Emhart Industries, Inc., No. 90-2321, 1991 WL 174228, * 2 (6th Cir. Sept. 6, 1991), also applying Michigan law and holding that an agent who had produced no evidence of a written or oral promise that he would receive post-termination commissions could not receive such commissions.
 
 
 33
 The district court concluded here that the contract language promising the plaintiffs a commission "for any inquiry instigated by your company" was ambiguous with regard to post-termination commissions. The court's decision to submit the matter to the jury was consonant with Michigan law, since "[g]enerally, when the terms of a contract are contested, the actual terms of the contract are to be determined by the jury even when the evidence of the contract terms is uncontradicted." Butterfield v. Metal Flow Corp., 462 N.W.2d 815, 818 (Mich.App.1990), citing Guilmet v. Campbell, 188 N.W.2d 601, 606 (Mich.1971).
 
 
 34
 The task of divining the intent of the parties with regard to post-termination commissions for sales to referred clients was not an easy one. The substance of the contract is contained in just one sentence: "We are pleased to quote the price adding five (5) percent to our cost as your commission for any inquiry instigated by your company." We might not have interpreted this language as broadly as the jury did, but our job is to determine whether the jury's verdict is a permissible one, not whether a different result might be preferable. See J.C. Wyckoff, 936 F.2d at 1487. We believe that the jury's interpretation was a permissible one, and the trial court's decision to deny the company's motion for a new trial on liability was not an abuse of discretion.
 
 IV
 
 35
 Hyosung argues that the plaintiffs' claims for breach of contract were not ripe insofar as future damages were sought. Determining whether a claim is ripe for adjudication involves a weighing of three factors: first, the likelihood that the harm alleged will ever come to pass; second, the sufficiency of the factual record; and, third, the hardship that refusing to entertain the plaintiff's claims would create for the parties. United Steelworkers of America, Local 2116 v. Cyclops Corp., 860 F.2d 189, 194-95 (6th Cir.1988).
 
 
 36
 We place particular importance on the first factor, the likelihood that the alleged harm will ever come to pass. Id. The plaintiff "must demonstrate a realistic danger of sustaining a direct injury" in order for his claim to be ripe. Babbitt v. United Farm Workers National Union, 442 U.S. 289, 298 (1979). Moon and Zies can make such a demonstration. They allege that Hyosung will fail to pay commissions for sales the company makes in the future to referred clients. The company has made no secret of its intention not to pay such commissions, and in keeping with that intention no commission was paid on the second contract with BMY. The level of sales the company made to referred clients before terminating the agency suggests strongly that future sales, in some amount, are highly likely. That likelihood, coupled with Hyosung's stated intention not to pay commissions on future sales, easily supports a conclusion in favor of the plaintiffs with regard to the first factor.
 
 
 37
 The second factor is more problematical. In Cyclops Corp., an ERISA case involving funding of a pension plan, the uncertainty of a company's ability to pay pension benefits after going through Chapter 11 bankruptcy proceedings, coupled with the likelihood that the amount a government agency would pay upon any default would fluctuate in the future, militated in against the exercise of jurisdiction, because it was entirely possible that the defendant corporation might have no residual liability at all. 860 F.2d at 195. It is highly unlikely that the defendant would have no residual liability in the case at bar. The contingent nature of future Hyosung sales to referred customers complicates the computation of damages, but the likelihood that the company will face no obligation at all is remote.
 
 
 38
 The ripeness doctrine is concerned primarily with the justiciability of claims, not with certainty as to the quantum of damages, and the second factor is frequently viewed, rightly or wrongly, as being of prudential rather than constitutional origin. See E. Chemerinsky, Federal Jurisdiction, Sec. 2.4.1, at 101 (1989). See also Koehring Co. v. Adams, 605 F.2d 280, 282 (7th Cir.1979) (suggesting that prudential ripeness concerns may be waived by failure to raise them in the district court).
 
 
 39
 As to the third factor, the plaintiffs name two obvious harms that would flow from a decision against them on the ripeness issue. They would not get paid as soon as they ought to, and they would have to spend more time in court in order to get their money. Predictably, Hyosung does not suggest that it would suffer harm if this court determined that the case was not ripe.
 
 
 40
 In light of the three factors cited in Cyclops, we are persuaded that the instant dispute was ripe for adjudication.
 
 
 41
 Hyosung argues the plaintiffs' claim is unripe for an alternative reason. Under applicable Michigan law, the company suggests, the plaintiffs' claims for commissions resulting from future sales to referred clients will not accrue until the sales themselves are consummated. The company cites Michigan authority for two principles: first, that an action for breach of an installment contract accrues only as each installment falls due, and, second, that the doctrine of anticipatory repudiation, which would normally support an award for future damages, does not apply if the repudiating party has already received all of the agreed exchange for the duty it repudiates.
 
 
 42
 Hyosung has not shown why the first principle should control the outcome in this case. There has been no demonstration that the agency agreement here at issue was an installment contract, whatever that term may mean in Michigan jurisprudence.
 
 
 43
 The proposition that damages based upon anticipatory repudiation are available only with respect to bilateral contracts might well have seemed persuasive to the trial court had the issue been raised there. But Hyosung did not raise the issue--not in its motion for summary judgment, not in its trial brief, and not in a motion to dismiss, a motion for a directed verdict, or an objection to the proposed jury instructions. The issue was not even raised in the post-trial motions to vacate the judgment and for a new trial. The failure to raise this issue in the trial court means that it cannot be raised here in any context other than a jurisdictional one. See Rules 50(b), 51, Fed.R.Civ.P.
 
 
 44
 As far as ripeness is concerned, Hyosung's argument has an air of plausibility. If Michigan would truly require the plaintiffs to wait until each post-termination sale to a referred client had been completed before the plaintiffs could collect a commission on that sale, there is obviously a sense in which the plaintiffs' claim for future damages is not yet 'ripe.' The federal ripeness doctrine, however, arose out of concerns regarding advisory opinions, and it is aimed at "prevent[ing] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). The case at bar is much more than an abstract disagreement. The parties' positions are firmly set. Hyosung has withheld all commissions from the second BMY contract--commissions that the parties agree would total $450,000--and the company has made clear its intention not to pay any more commissions in the future. The concerns behind the ripeness doctrine are not implicated here.
 
 
 45
 The limitation in our holding in this respect should be self-evident, but we shall make it explicit. The question whether under Michigan law an agent may recover commissions for future sales in an action brought before such sales are consummated is not before this court because the defendant repeatedly failed to preserve that question in the trial court. Had the case been tried in a Michigan state trial court in similar fashion, a Michigan appellate court would presumably have refused to entertain the legal question on appeal.
 
 V
 
 46
 The standard of review for verdicts alleged to be excessive has been articulated in two principal ways. First, the jury verdict is not excessive unless it is beyond the "maximum damages that the jury reasonably could find to be compensatory for a party's loss." Green v. Francis, 705 F.2d 846, 850 (6th Cir.1983); see also Leila Hospital and Health Ctr. v. Xonics Medical Systems, Inc., 948 F.2d 271, 278 (6th Cir.1991) and In re Lewis, 845 F.2d 624, 635 (6th Cir.1988). Second, "[a]bsent a showing of bias, passion, or corruption, the excessiveness of a verdict is left to the trial court's discretion. The appellate court will only consider whether the trial court abused its discretion by granting an award so large as to shock the judicial conscience." Thompson v. National R.R. Passenger Corp., 621 F.2d 814, 827 (6th Cir.), cert. denied, 449 U.S. 1035 (1980); see also Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1207 (6th Cir.1988). Cf. Neyer v. United States, 845 F.2d 641, 644 (6th Cir.1988) (verdict must be so grossly excessive as to be clearly erroneous before it will be reversed).
 
 
 47
 The plaintiffs bore the burden at trial of producing evidence of future commissions to a reasonable degree of certainty. The amount of such commissions could not be based solely on conjecture and speculation. Bonelli v. Volkswagen of America, Inc., 421 N.W.2d 213, 226 (Mich.App.1988). In the case at bar the jury did have before it a business plan prepared by Hyosung projecting sales made by the company's Detroit office. The plan projected sales for the four years from 1990 through 1993, both inclusive, as $14.38 million, $15 million, $16.5 million, and $19 million respectively. Dr. Moon testified that he and Mr. Zies were responsible for all of the projected sales except for $500,000, $1 million, $1.5 million, and $2 million in the respective years. (These last figures represent an entry denominated "Paint" which Dr. Moon identified as exports to Korea that would not factor into the commissions). Dr. Moon admitted that he could present no evidence that $3 million in projected new business in 1993 would be generated from contacts he and Zies generated for the company.
 
 
 48
 Mr. Zies testified that the sales projections were consistent with the growth that could be achieved drawing from the customer base that he and Dr. Moon had introduced to the company. The Hyosung Detroit office could achieve these figures, according to Zies, despite the company's failure to win a contract that had been budgeted as generating sales of $3.6 million, $4 million, $7 million, and $11 million in 1990 through 1993.
 
 
 49
 We conclude that Hyosung's sales projections and the testimony of Zies and Moon simply did not suffice to establish with reasonable certainty that the plaintiffs were entitled to commissions of $2 million apiece for post-termination sales. Zies's testimony that the company would be able to make up for the loss of projected sales of $25.6 million under a contract it did not secure was purely speculative. Additionally, as Dr. Moon noted, no evidence was elicited at trial to demonstrate what percentage of Hyosung's new business after the termination of the agency agreement would be with customers introduced by the plaintiffs. After these items--sales based upon the contract not won, the "Paint" entries, and new business sales beginning in 1993--are excluded from the equation, the projected sales do not add up to $80 million, the level necessary to generate $4 million in commissions, even when sales for the next decade are considered. The jury's verdict could only have been the result of speculation, and the district court abused its discretion in declining to grant the defendant a new trial on the amount of damages.
 
 
 50
 The judgment on count I is VACATED as to damages only, and the case is REMANDED for a new trial on that issue. In all other respects the judgment is AFFIRMED.
 
 
 
 *
 The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 The company is guilty at times of lapsing into attacks on the sufficiency of the evidence. At pages 41-42 of its opening brief in this court, Hyosung asserts that Dr. Moon's testimony is "wholly insufficient as a matter of law to support the jury's verdict as to post-termination commissions not procured by plaintiffs...."