RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0320p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

INNOTEXT, INC.,

             *Plaintiff-Appellant,*

    *v.*

No. 10-2010

PETRA'LEX USA INC., d/b/a PTX TEXTILES, INC.,

             *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:08-cv-11077—Sean F. Cox, District Judge.

Argued: April 11, 2012

Decided and Filed: September 11, 2012

Before: BATCHELDER, Chief Judge; McKEAGUE, Circuit Judge; QUIST, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Richard B. Tomlinson, DRIGGERS, SCHULTZ & HERBST, P.C., Troy, Michigan, for Appellant. Kathleen L. Bogas, BOGAS, KONCIUS & CROSON P.C., Bingham Farms, Michigan, for Appellee. **ON BRIEF:** Richard B. Tomlinson, DRIGGERS, SCHULTZ & HERBST, P.C., Troy, Michigan, for Appellant. Kathleen L. Bogas, Charlotte Croson, BOGAS, KONCIUS & CROSON P.C., Bingham Farms, Michigan, for Appellee.

_____

## OPINION

_____

    QUIST, District Judge. This case involves an oral contract between an automotive manufacturer's sales representative and a company that it represented. The representative filed a four-count complaint alleging that it was not paid commissions

_____

[*]The Honorable Gordon J. Quist, United States Senior District Judge for the Western District of Michigan, sitting by designation.

pursuant to the oral contract. After the representative presented its proofs to the jury, the district court granted the defendant's directed verdict on all four counts. Because there is sufficient evidence, or at least enough so that reasonable minds can differ, to find in favor of the representative, the dismissals of Counts I, II, and IV are reversed and remanded for further proceedings. The district court's dismissal of Count III is affirmed.

## BACKGROUND

Plaintiff, Innotext, Inc., is a Michigan corporation that represents automotive manufacturers. Colin Stafford is the Vice President of Innotext. Stafford has worked as a manufacturer's sales representative in the automotive industry for over 40 years.

Defendant, Petra'Lex USA, Inc., is a North Carolina corporation, owned by Charles Sadosky and his wife. Sadosky and his wife also own 98 percent of the assets of a company in Honduras called Petra'Lex S. de R.L. Sadosky and his wife also have an ownership interest in a company in China called PTX Textiles, Inc., and another U.S. company called PTX Commercial, Inc. Petra'Lex USA is a sales, service, and support company that represents Petra'Lex S. de R.L., PTX Textiles, and another Honduran company called Capa SA. In return, the three offshore companies pay $40,000 a month to Petra'Lex USA to support its expenses and selling efforts on their behalf. PTX Textiles works with Chinese factories to develop and manufacture cloth. Petra'Lex S. de. R.L. manufactures textile components into finished products and is commonly referred to as a "cut and sew" operation.

In the 1990s, automakers outsourced work overseas to reduce labor costs. Stafford, to maintain his business with automotive companies, began looking for offshore companies that had the ability to manufacture automotive textile products. In 1999, Stafford contacted Sadosky by phone and found out that Sadosky owned Petra'Lex USA and had an affiliated sewing company in Honduras. At that time, Petra'Lex USA and its Honduran affiliate were not selling to the automotive industry. The initial opportunity about which Stafford contacted Sadosky—producing cargo nets for General Motors—did not lead to any business, but the parties continued to explore opportunities for Petra'Lex USA and its Honduran affiliate.

In 2002, Keith Woolcox, a buyer for Intier, a company which supplied seating components to automakers, had a business discussion with Stafford. Stafford told Woolcox that he had found a company with a low-cost Honduras cut-and-sew operation. Woolcox suggested setting up a meeting at Intier to discuss the opportunities.

Through a series of emails, the parties made arrangements for Sadosky to meet at the Intier headquarters in Farmington Hills, Michigan. (R. 86-1, Trial Ex. B.) "Colin Stafford/INTX," with the email address "INTX@prodigy.net," sent an email to Woolcox to find possible dates for a meeting. Sadosky picked a mutually agreeable date, June 4, 2002, on which all of the parties could meet. "Colin Stafford/INTX" told Sadosky "I can pick you up at [the] airport. Lets shoot for 1100 hrs and lunch."

As planned, Stafford picked up Sadosky, and the two went to Intier to meet with Woolcox. At the meeting, all three individuals passed out business cards. Sadosky's business card indicated that he was the President of Petra'Lex USA. Stafford's business card indicated that he represented Innotext.

Also as planned, after the meeting at Intier, Stafford took Sadosky to a restaurant, Cosi, for lunch. Stafford and Sadosky talked business over lunch. Sadosky explained to Stafford that he had not done any business in the automotive industry. Stafford talked about his background as a manufacturer's representative and told Sadosky that it may take several years for Sadosky's company to obtain business in the automotive industry. At trial, Stafford testified about what he told Sadosky at lunch:

> Yeah. I said, you know, "You – if you come into this business, you're a non-entity. You have very little credibility. Nobody knows who you are. You're a brand new person."
>     I said, "It could be three to five years before you get any business, and most of the suppliers needed to be put on an approved source list."
> . . .
> There were a lot of requirements for that. I told him there was a considerable amount of up-front cost in developing things . . . .

(R. 79 at 36-37.)

Stafford also explained to Sadosky how sales representatives work:

> Well, I told him that sales representatives usually work on the basis of representing a company.
>
> . . .
>
> That [sales representatives] are paid on commission on sales that they bring into the company or on programs they develop.
>
> . . .
>
> I told him that because, as a sales representative for a new company, you have a lot of upstream costs, where, you know, for three years you're developing a sales operation for this company. And so the downstream side of that would be that commissions were paid for the life of programs that the sales representative would bring in. And even sometimes for the life of the part . . . .

(R. 79 at 37-38.)  Regardless of the efforts made by a representative, a representative does not get paid unless a company consummates a sale.

Stafford testified that he expressed great interest in working with Sadosky:

> I told him that I would be extremely interested in representing his company. I thought that he had – as I said before, I like little niche markets, people that have an advantage.
>       I thought that his company had an advantage in its low-cost sewing. I thought that could generate a lot of business, because I had customers, obviously. In the meeting of that day, we had a customer [(Intier)] who was looking for somebody to do that.

(R. 79 at 38-39.)

Stafford then made an offer.  According to Stafford, "I said to him that I would represent his companies for three percent sales commission for the life of the parts or the life of the programs."  Later at trial, Stafford similarly testified that he "explained to Mr. Sadosky that I would represent him for three percent sales commission."

Stafford explained Sadosky's response:  "He said to me, 'that sounds like a good deal, okay.' And we had a handshake agreement."

Stafford testified that, based on the handshake agreement, he sought to generate business for Petra'Lex USA.  Stafford said that his expectation was that if he brought "an opportunity" to "Petra'Lex or its affiliates" he would be paid a commission.

Pursuant to the agreement, Stafford asserts that Petra'Lex USA was bound to pay commissions to Innotext from four different sales. The first, which is not a subject of this dispute, was a sale made to Fairway Products, an automotive company based in Hillsdale, Michigan. In that transaction, Fairway officially signed the contract with Petra'Lex S. de R.L. In turn, Petra'Lex S. de R.L. manufactured the parts and also received the revenues from the sale. Even so, Innotext received a one-percent commission from the sale. (According to Innotext, Stafford did not know that the commission was not three percent because Sadosky did not give him the sales figures.) The remaining three sales, which are the subject of this dispute, were made to Johnson Controls, Inc. (JCI).

On January 2, 2004, Sadosky, "cj.sadosky@petralex.com," sent an email informing numerous persons, including "Colin Stafford" at "INTX@prodigy.net," that Jim Meek "joined Petralex USA as Manager of Textile & Automotive Products." (R. 86-2, Pl.'s Trial Ex. D.) Sadosky also said that "[Stafford] will continue to open doors for Petralex in this market and he will work with Jim regularly in the startup of these new products."

In 2005, Meek gave Stafford a box of textile samples. Stafford took the samples to JCI. Numerous interactions ensued between Stafford/Innotext and JCI. Eventually, Stafford came into contact with a buyer at JCI who worked on the "Under Cover Program." According to Stafford, Stafford was the liaison between JCI and Petra'Lex USA throughout a lengthy relationship. Throughout the relationship, though, JCI referred to the company that Stafford represented as "PTX." In addition, Meek sent a company overview to JCI that was entitled "PTX Textiles, Inc.," which described PTX as a "wholly owned subsidiary" of Petra'Lex, a Winston Salem, North Carolina corporation with a manufacturing plant in Honduras. But Sadosky testified that the overview was really meant to describe Petra'Lex USA.

On November 1, 2006, JCI sent an email to Meek, "jmeek@petralex.com," and Stafford, "intx@comcast.net," requesting the two to attend a meeting. Meek put together

a PowerPoint presentation for the meeting.**1**  During the presentation, Meek said that a sales representative would continue to work in Detroit and, pointing at Stafford, said that Stafford would be present to handle day-to-day operations.

At the conclusion of the meeting, JCI advised Meek and Stafford that JCI was awarding them the Under Cover Program.  JCI awarded the Under Cover Program to Petra'Lex S. de. R.L.  Production began in February, 2007, and sales began in April, 2007.  $22,000,000.00 of sales were made to JCI on the Under Cover Program, and allegedly continue to be made.  Innotext has not received any commissions in connection with the Under Cover Program.

Innotext alleges that its efforts created an opportunity for Petra'Lex USA, which involved providing a "Duon Replacement" fabric called "Trem" for JCI.  Trem sales to JCI have amounted to $50,000 per month.  Sales of Trem began in May of 2009.  Even though Innotext's relationship with Petra'Lex USA ended in 2007, Innotext seeks commissions on Trem sales to JCI.

It is undisputed that the only sales Innotext made of Grid Mesh were sample orders.  Liability for commissions on Grid Mesh is limited to $120.00.

In mid-September 2007, Sadosky informed Stafford that he was not going to pay Stafford/Innotext any money for commissions on the Under Cover Program.  On November 1, 2007, Sadosky sent a letter, on behalf of PTX Textiles, Inc., terminating the business relationship with Stafford.**2**  Stafford, on behalf of Innotext, wrote a detailed letter to Sadosky, Petra'Lex USA, Inc., PTX Commercial, Inc., and PTX Textiles, Inc.,

---

**1**The PowerPoint, like the company overview earlier provided by Meek, makes a pitch on behalf of "PTX."  PTX, however, is literally a fiction.  For example, it starts out by saying "PTX has [a] cut and sew facility in place in Honduras."  This is not true because, according to Petra'Lex USA, a) there is no company called PTX, b) Petra'Lex S. de. R.L. is a Honduran company, but it is not affiliated with any other company, and c) Petra'Lex USA is an American company, but it is not affiliated with any other company and merely works with a Honduran company.

**2**Among other things, the letter said that "NPNW is the only ongoing project today.  We will work out a compensation agreement with you for sales made on NPNW (for some period to be determined) *if business begins*." (R. 86-23, Pl.'s Trial Ex. NNNN (emphasis added).)

explaining his efforts with the Under Cover Program and his belief that he was entitled to three percent commissions for those efforts.

Innotext filed suit seeking to recover commissions that it claims to have earned relating to the three products, lines, or programs that it claims were developed for, and sold to, JCI: (1) the seat cushion assembly "Under Cover Program"; (2) the "Grid Mesh" fabric; and (3) and the alleged "Duon replacement" fabric called "Trem."

Innotext's amended complaint asserts four counts: Breach of Contract (Count I); Violation of Michigan's Sales Representatives Commission Act (SRCA), MCLA § 600.2961 (Count II); Breach of Implied Contract (Count III); and Unjust Enrichment/Procuring Cause (Count IV).

Trial began on June 21, 2010. At the close of Innotext's proofs on June 28, 2010, Petra'Lex USA made an oral motion pursuant to Fed. R. Civ. P. 50(a), seeking judgment as a matter of law on all claims. The district court heard oral argument at that time. On June 29, 2010, Petra'Lex USA filed a brief in support of its motion. On June 30, Innotext filed a brief in opposition to the motion. On July 6, 2010, the district court granted Petra'Lex USA's Rule 50 motion on all counts.

## STANDARD OF REVIEW

This Court uses the same test that the trial court applies when reviewing a trial court's decision on a motion for judgment as a matter of law. *Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 796 (6th Cir. 1996).

A court may grant judgment as a matter of law where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on a dispositive issue. Fed. R. Civ. P. 50(a). Because this is a diversity case, this Court must use the standard of review of the Michigan courts. *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 466 (6th Cir. 2009). "Michigan courts use the terms 'directed verdict' and 'judgment notwithstanding the verdict' rather than judgment as a matter of law." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 894 n.3 (6th Cir. 1997). "[A] directed verdict may be granted only if, after viewing all of the evidence in the light most favorable to the party

opposing the directed verdict, reasonable minds could not differ on any question of material fact." *Betts*, 558 F.3d at 467 (citation omitted). The trial court must consider only evidence presented at trial. "In passing upon a motion for directed verdict, a trial judge must consider the evidence in plaintiff's favor *unqualified* by any conflicting evidence." *Locke v. Pachtman*, 521 N.W.2d 786, 791 n.8 (Mich. 1994).

## ANALYSIS

"[W]here an express [oral] contract is entered into between parties, but they differ as to the terms thereof, and there is evidence tending to support the claim of each of them, it is for the jury to determine what the terms of the contract were . . . ." *Biagini v. Mocnik*, 120 N.W.2d 827, 828 (Mich. 1963) (internal quotation marks omitted). The key question for this appeal is whether "there is evidence tending to support the claim" of Innotext. If so, and reasonable minds could differ on a question of material fact, the directed verdict should have been denied.

### I.     Breach of Contract Claim (Count I)

To form a contract, the parties must have a "meeting of the minds" on all essential terms of the contract. *Sanchez v. Eagle Alloy Inc.*, 658 N.W.2d 510, 517 (Mich. Ct. App. 2003). Whether there has been a meeting of the minds is "judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kamalnath v. Mercy Mem'l Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992) (citation omitted).

> In analyzing oral statements for contractual implications, a court must determine the meaning that reasonable persons might have attached to the language. In order to determine whether there was mutual assent to a contract, the court applies an objective test, "looking to the expressed words of the parties and their visible acts." The court considers the relevant circumstances surrounding the transaction, including all writings, oral statements, and other conduct by which the parties manifested their intent.

*Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 794 (Mich. Ct. App. 1993) (citations omitted); *see also Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 598 (Mich. 1993).

The district court found that Innotext presented "insufficient evidence at trial to establish that the parties had a meeting of the minds as to the essential terms of the alleged contract." Specifically, the district court found that the parties did not have a meeting of the minds with respect to a) the parties, and b) the subject of the contract.

## A.        The Parties

The district court held that Innotext failed to present sufficient evidence of the parties' express words and visible acts to establish a meeting of the minds as to the parties. The district court noted that, even if Sadosky presented his business card at Intier, later on at lunch, Sadosky discussed several of his companies. Moreover, Stafford's express language used to communicate his offer did not identify the offeror or offeree by their company name. Then, Sadosky's acceptance did not identify the company on behalf of which he accepted—Petra'Lex USA, Petra'Lex S. de R.L., or PTX Textiles.

The district court erred because reasonable minds can differ as to whether the parties had a meeting of the minds as to the parties to the contract. Innotext presented evidence of express words and visible acts indicating that Sadosky was acting on behalf of Petra'Lex USA, Stafford was acting on behalf of Innotext, Sadosky thought the offer was coming from Innotext, and Stafford thought that Sadosky was accepting on behalf of Petra'Lex USA.

Persons dealing with an agent may rely on apparent authority and such authority is to be gathered from all of the facts and circumstances properly admitted into evidence. *Grinnell v. Carbide & Carbon Chems. Corp.*, 276 N.W. 535, 541 (1937). In *Grinnell*, the court found that an agency relationship existed and said that "[o]ne of the elements relied upon by plaintiffs to prove the agency . . . was the business card [of the agent] which indicated that he represented [the] defendant company." *Id.* In another case, letterheads were used as evidence of an agency relationship. *Randall v. J.A. Fay & Egan Co.*, 123 N.W. 574, 575 (1909).

1.       Sadosky acted as an agent of Petra'Lex USA

Here, Sadosky passed out a Petra'Lex USA business card.  Reasonable minds could view this evidence alone and differ on whether Sadosky continued to act as an agent of Petra'Lex USA.  Petra'Lex USA argues, however, that this does not establish Sadosky *continued* to act as an agent at lunch.  That argument is unavailing because "[o]ne who has dealt with an agent in a matter within the agent's authority has a right to assume, if not otherwise informed, that the agent's authority continues." 1 Mich. Civ. Jur. Agency § 39 (2012) (citing *Don G. McAfee, Inc. v. Great Am. Indem. Co.*, 286 N.W. 189, 190 (Mich. 1939)).  Also, the scope of the agency relationship is a question of fact. *See Jackson Cnty. Educ. Ass'n v. Grass Lake Cmty. Sch. Bd. of Educ.*, 291 N.W.2d 53, 55 (Mich. Ct. App. 1979).  Here, Sadosky's entire trip was for business, the parties planned to have a meeting *and* lunch, and the parties continued to talk business over lunch.  Therefore, after Sadosky handed out his Petra'Lex USA business card, Stafford had no reason to believe that Sadosky stopped acting as an agent of Petra'Lex USA.  In addition, it would be natural for anyone to assume that Sadosky was always acting as the agent of Petra'Lex USA because Stafford and Sadosky were there to talk about sales and Petra'Lex USA was the United States sales arm of the foreign factories.  At the very least, reasonable minds could differ as to whether Sadosky continued to act within the scope of his agency.

2.       Stafford acted as an agent of Innotext

Stafford set-up the Intier meeting *and subsequent lunch* through his email, which indicated he was acting on behalf of "Colin Stafford/INTX," with the email address "INTX@prodigy.net."  If letterheads and business cards can be used to evidence an agency relationship, emails are also a proper consideration.  In addition, like Sadosky, Stafford handed out a business card at the Intier meeting, which indicated he represented Innotext.  These are two objective manifestations that Stafford was acting, and also that Sadosky knew Stafford was acting, as an agent of Innotext.  At the very least, reasonable minds could have differed.

3.       Sadosky accepted on behalf of Petra'Lex USA

The district court found that Innotext failed to identify "any evidence to indicate that Sadosky accepted the offer on behalf of Petra'lex USA, Inc., as opposed to Petra'Lex S. de R.L. or PTX Textiles, Inc."  Petra'Lex USA points out that "[i]t is a well-recognized principle that separate corporate entities will be respected." *Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995).  The district court's finding is incorrect.  Once again, the business of Petra'Lex USA and Innotext was sales, so the natural assumption, in the absence of evidence to the contrary, is that the parties continued their sales relationship during the course of their dealing.  Furthermore, while it is true that separateness of distinct entities will be respected, it is also true that a person can be an agent for more than one principal in the same matter.  *See* 1 Mich. Civ. Jur. Agency § 17 (2012) (citing *Adams Min. Co. v. Senter,* 26 Mich. 73 (1872)).  Thus, Sadosky could have been acting as an agent for all three companies at once.  Moreover, the objective evidence shows, or at the very least could support a reasonable finding, that Petra'Lex USA accepted Innotext's offer:

1.       Sadosky did not accept on behalf of PTX Textiles because it was not a company in existence on June 4, 2002.

2.       On June 4, 2002, Petra'Lex S. de R.L. had not been mentioned by name to anyone.  Petra'Lex USA was the *only* company name used on June 4, 2002.

3.       Also telling, Sadosky's January 2, 2004, email announcing the hiring of Jim Meek objectively shows that Stafford accepted Innotext's offer to represent Petra'Lex USA.  Sadosky, writing from "cj.sadosky@**petralex**.com," informed "Colin Stafford" at "**INTX**@prodigy.net," that Jim Meek "joined **Petralex USA** as Manager of Textile & Automotive Products."  Sadosky also said that "[Stafford] will *continue* to open doors for **Petralex** in this market and he will work with Jim regularly in the startup of these new products."  According to

this email, a relationship between Petra'Lex USA and Stafford/Innotext had already been formed and the parties wanted it to continue.

4.     Sadosky testified at trial:

Q:     And before that time, before January 2, 2004, Innotext was the company that was working on automotive sales, correct?

A:     Yes

Q:     You didn't have any other sales reps that were working on automotive sales for Petra'Lex USA, Inc. or any of the affiliates, did you?

A:     No.

(R. 81 at 160-61.)

In addition, keep in mind the earlier emails setting up the meeting *and lunch*, and also the exchange of business cards at Intier.  Considering the objective manifestations of the parties, reasonable minds could differ in determining whether, on June 4, 2002, a contract had been formed between Petra'Lex USA and Innotext.

The district court found significance in the fact that Sadosky and Stafford never used the words "Innotext" or "Petra'Lex USA" when making and accepting the offer.  In our judgment, this ignores the realities of the situation.  Except in formal writing, two individuals rarely refer to each other in the names of their businesses.  Two individuals verbally communicating use pronouns like "you," "your," or "I," instead of referring to themselves and the other person as "it"—the proper pronoun referring to a company entity.  *See Barber*, 509 N.W.2d at 794 ("In analyzing oral statements for contractual implications, a court must determine the meaning that reasonable persons might have attached to the language.").  Moreover, it is well known that companies act through their agents.  As evidenced by the entire purpose of the trip, the exchange of business cards, business conversations, and emails, Stafford and Sadosky were on a business trip and were talking business when the relevant conversations occurred.  The two individuals were meeting for business, not to talk about individual personal gain.

Therefore, the district court erred by finding that there was insufficient evidence to find that the parties had a meeting of the minds as to the parties to the contract.

### B.      The Subject of the Contract

A second issue is whether Innotext presented sufficient evidence for the jury to find that the parties had a meeting of the minds as to the subject of the contract. As the district court said, "Plaintiff's assertion that Defendant agreed to pay him commissions on any 'sales opportunity brought to defendant by plaintiff' is central to Plaintiff's case because in this action Plaintiff is seeking to recover commissions on sales orders that Plaintiff did not obtain." Thus, the district court found it to be an essential requirement of the asserted contract that Innotext "obtain" the sales opportunity to recover commissions.

The district court said that Innotext did not introduce any objective evidence that the parties agreed to this essential term of the contract. First, the district court said, "Plaintiff has not directed this Court to any portion of Stafford's trial testimony wherein he testified that his offer to Sadosky on June 4, 2002, included that Plaintiff would be paid commissions on all sales made by Defendant to automotive customers 'relating to any sales opportunity brought to defendant by plaintiff.'" In addition, even if Innotext included this term in the offer, the district court said that "there is no evidence to establish that the parties had a 'meeting of the minds' as to the meaning of the amorphous concept of 'bring a sales opportunity' to Defendant without actually making a direct sale."

As to the first finding, the district court sought evidence that the parties agreed to a particular *interpretation* of the contract, rather than analyzing whether Innotext presented evidence that the parties agreed to the contract itself.

Construing the evidence in the light most favorable to Innotext, this is the offer that Petra'Lex USA accepted: "I [Stafford] would *represent* his [Sadosky's] companies for three percent sales commission for the life of the parts or the life of the programs." (R. 79 at 39 (emphasis added).) At oral argument on Petra'Lex USA's Rule 50 motion,

as Innotext's counsel put it, Innotext sought payment on commissions "relating to any sales opportunity brought to defendant by plaintiff." This is an *interpretation* of the above offer that Petra'Lex USA accepted, and it is not an unreasonable interpretation. More specifically, this is an interpretation of how a representative is paid to "represent" a company; and there is certainly evidence that Petra'Lex USA understood this to be the interpretation of the contract. Before Petra'Lex USA entered into the contract, Stafford told Sadosky what it means to "represent" a company:

> Well, I told him that sales representatives usually work on the basis of representing a company.
>
> . . .
> That they are paid on commission on sales that they bring into the company or *on programs they develop*.

(R. 79 at 37 (emphasis added).)

Thus, contrary to the district court's second assertion, Innotext presented evidence that this term was encompassed in the agreement that Innotext would "represent" Petra'Lex USA. A reasonable person interpreting the contract could think that Innotext would be paid on "programs it develops," even though in some instances this may not entail Innotext's directly obtaining the customer's signature on the purchase order. This is how sales representatives usually work; they bring sales opportunities to companies, and employees of the companies often sign the contracts and obtain the signatures of customers. *See Barber*, 509 N.W.2d at 794 ("In analyzing oral statements for contractual implications, a court must determine the meaning that reasonable persons might have attached to the language."). After all, Innotext, not being the supplier or employee of Petra'Lex USA, had no authority to sign anything on behalf of Petra'Lex USA, or any other company with which Sadosky was associated. In fact, Innotext's role in obtaining the project from JCI could have been concluded long before the actual purchase order was signed by JCI — for example, after further design and engineering work on the project. Regardless, it should have been for the jury to decide because this goes to interpreting the contract.

This entire issue boils down to what the parties meant when Innotext said that it would "represent" Petra'Lex USA and, consistent with those intentions, whether Innotext was owed commissions. In *Kingsley Associates, Inc. v. Del-Met, Inc.*, 918 F.2d 1277 (6th Cir. 1990), the plaintiff, an automotive manufacturer's representative, sought commissions due on an oral contract with the defendant, a manufacturer. *Id.* at 1278. The oral contract provided that the plaintiff would be paid "for the life of the part." *Id.* at 1280. As soon as the parties' relationship ended, however, the defendant stopped paying the plaintiff any commissions, even though some of the parts being shipped had originally been sold to the plaintiff's customer prior to the termination of the parties' relationship. *Id.* The plaintiff said that its oral agreement to receive commissions on sales "for the life of the part" meant that it was entitled to commissions for sales of parts it had originally sold for the defendant, as long as the parts buyer continued to purchase the part. *Id.* The jury awarded the plaintiff the commissions, but the district court granted a judgment notwithstanding the verdict for all post-termination commissions because it found "no evidence in this case at all that there was any agreement between these parties for payment of commissions post-termination." *Id.*

The Sixth Circuit reversed because it agreed with the plaintiff that "there was sufficient evidence to permit the jury to determine that the oral agreement . . . entitled [the plaintiff] to post-termination commissions on sales it had procured prior to the termination of the relationship." *Id.* at 1281. The entire evidence was testimony that the agreement called for commissions on sales that the plaintiff negotiated "for the life of the part." *Id.* at 1281. The only evidence to the contrary was that the manufacturer could not recall any discussion between the parties concerning compensation post-termination. *Id.* Hence, the question for the jury was whether "for the life of the part" meant that the representative was entitled to commissions post-termination on sales that he had negotiated pre-termination. *Id.* As this Court said, this question "was indeed for the jury to determine."

> "[W]here the terms of a negotiation are left to oral proofs, the question
> of what the parties said and did, and what they intended should be
> understood thereby, is single and cannot be separated so as to refer one

> part to the jury and another part to the judge; but in its entirety the question is one of fact."

*Id.* at 1281-82 (quoting *McKenzie v. Sykes*, 11 N.W. 164, 165 (Mich. 1882)). Thus, this Court held that the district court erred in granting a judgment notwithstanding the verdict which precluded the plaintiff from recovering post-termination commissions as a matter of law. *Id.* at 1283.

Likewise, here, the jury should have been able to determine what the parties intended by agreeing that Innotext would "represent" Petra'Lex USA. The communications surrounding contract formation are evidence from which reasonable jurors could find that Innotext was entitled to post-termination commissions. Besides the communications surrounding the contract formation itself, and also like *Kingsley*, the termination letter that Sadosky sent to Stafford indicates that he contemplated *some* post-termination compensation. It says that the parties would work out a compensation agreement on a project "if business begins." Like *Kingsley*, these two pieces of evidence, alone, should be enough to allow the jury to determine whether Innotext is entitled to post-termination commissions on sales opportunities that Stafford brought to Petra'Lex USA.

Therefore, construing the evidence in the light most favorable to Innotext, reasonable minds could differ about whether the parties agreed on all essential terms of the contract—particularly, on the meaning of their agreement that Innotext would "represent" Petra'Lex USA. Therefore, the dismissal of Count I will be vacated.[3]

## II. Violation of the SRCA (Count II) and the Procuring Cause Doctrine

Innotext asserts that the district court erred by dismissing Count II, alleging violations of the SRCA, MCLA § 600.2961, and also by dismissing its claim under the

---

[3]Petra'Lex USA argues that Innotext's breach of contract claim for the Trem fabric sold to JCI should be dismissed for "lack of evidence." As Petra'Lex USA notes, however, the district court did not reach this issue. Indeed, the district court solely determined whether a contract had been formed, and therefore did not address whether that contract had been breached. Innotext never raised this issue on appeal and did not address it in its reply brief. Therefore, we decline to address this issue at this time.

procuring cause doctrine.[4]   The sole basis for these arguments is that the district court incorrectly dismissed Innotext's breach of express and implied contract claims.

The district court dismissed these two claims as a matter of law based on its finding that no contract existed between the parties.  However, since the dismissal of Count I is to be vacated and the case remanded, so too must the dismissal of Count II, alleging violations of the SRCA and Innotext's claim under the procuring cause doctrine, be vacated and the claims remanded for further proceedings.

### III.     Breach of Implied Contract (Count III)

In the amended complaint, Count III is for "breach of implied contract" and Count IV is for "Unjust Enrichment/Procuring Cause."  On appeal, Innotext conflates the breach of implied contract and unjust enrichment claims.  In all material respects, Innotext's arguments on each claim are identical.

However, an "implied *in law*" claim differs from an "implied *in fact*" contract. An implied- in-fact contract still requires mutual assent to the essential terms of the contract, but is evidenced by the parties' course of dealing.  But, Innotext does not argue that an implied-in-fact contract exists.  Rather, Innotext's brief addresses only the district court's findings with respect to Count IV, for an implied-in-law contract claim.  In effect, Innotext does not argue that the district court erred by dismissing Count III, for a breach of an implied-in-fact contract, because Innotext addresses only the district court's dismissal of the unjust enrichment claim—i.e., asking the court to enforce a contract implied *in law*.

Therefore, Innotext has forfeited the argument that the district court erred by dismissing Count III.  The district court's dismissal of Count III must be affirmed.

---

[4]Count IV of the Plaintiff's Amended Complaint is titled "Unjust Enrichment/Procuring Cause." The district court correctly considered the "unjust enrichment" claim separately from the "procuring cause" claim.

## IV.    <u>Unjust Enrichment (Count IV)</u>

> The elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. In such instances, the law operates to imply a contract in order to prevent unjust enrichment. However, a contract will be implied only if there is no express contract covering the same subject matter.

*Barber*, 509 N.W.2d at 796 (internal citations omitted).

### A.    **Did Petra'Lex USA receive or retain any benefit?**

The district court first found that Innotext introduced insufficient evidence at trial to show that Petra'Lex USA received or retained any sales revenues or sales commissions on any of the sales at issue. The district court reasoned: (1) "Plaintiff has not directed this Court to any evidence presented at trial"; (2) the parties stipulated that "[i]n November 2006, [JCI] awarded the Under Cover Program to Petralex *S. de R.L.*"; and, (3) "Sadosky testified at trial that Defendant has never received any money as a result of sales of Under Covers, Trem, or Grid Mesh."

As Innotext points out, however, even though JCI awarded the Under Cover program to Petra'Lex S. de R.L., the evidence established that $22,000,000 in payments from JCI went into Petra'Lex USA's bank account. Sadosky admitted as much, and the banking records bearing Petra'Lex USA's federal tax ID number confirm it.

Petra'Lex USA responds that the *only* revenue received and retained by Petra'Lex USA was $40,000 per month to support its expenses and selling efforts for the companies that Petra'Lex USA represents. The $40,000 came from the companies that it represented. Petra'Lex USA contends that the money transferred from JCI to Petra'Lex USA's bank account is a straw transaction: "Sadosky's undisputed testimony was that this bank account was, in practice, an account for Petra'Lex S. de. R.L., that 'every transaction that goes through [that bank account] is a Honduras transaction, in and out,' and that the bank account records relied upon by Innotext Inc. are records for

financial activity by Petra'Lex S. de R.L." Petra'Lex USA does not provide any case law to support its argument.

Innotext has provided enough evidence to create a question of fact whether Petra'Lex USA received and retained a benefit from the Under Cover program. The evidence established that Petra'Lex USA received $22,000,000 in an account owned and operated by Petra'Lex USA. Moreover, even though Petra'Lex USA passed the money along to Petra'Lex S. de R.L., Petra'Lex USA still received a $40,000 per month salary in exchange for support services–which presumably includes transferring the payments from JCI. Whether Petra'Lex USA received and retained a benefit directly or through a *quid pro quo* transaction is of no consequence because "[w]hether a specific party has been unjustly enriched is generally a question of fact." *Inverson Indus., Inc. v. Metal Mgmt. Ohio, Inc.*, 525 F. Supp.2d 911, 921 (E.D. Mich. 2007) (quoting *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 903 (Mich. Ct. App. 2006)). Here, with the evidence presented, reasonable minds could differ as to whether Petra'Lex USA received a benefit from the Under Cover program.

### B.     Evidence of the Fair Market Value of Innotext's Services

The district court also found that, even if Innotext sought an award for the "fair market value" of its services that were provided to Petra'Lex USA (as opposed to Petra'Lex S. de R.L. or PTX Textiles, Inc.), the claim would be still dismissed for lacking a "sufficient evidentiary basis." The district court said that Innotext did not present any "evidence at trial as to the 'fair market value' of such services . . . or any other evidence that would enable [sic] the jury to make such an award without resort to sheer speculation."

Innotext argues that Stafford's trial testimony demonstrated the reasonable value of Innotext's services as a sales representative for Petra'Lex USA. Stafford testified that three percent commission was the "going rate" for sales representatives at the time of his work with Petra'Lex USA. Petra'Lex USA argues that Stafford's testimony is insufficient to sustain Innotext's burden of proof on the issue because Stafford testified that three percent was "around the number" and "probably the going rate." This

testimony, Petra'Lex USA contends, would require the jury to speculate on the value of Innotext's services. In addition, Petra'Lex USA argues that the three percent sales commission is not the value of services Stafford allegedly performed; rather, three percent is simply the commission sought by Innotext through its breach of contract claim.

The district court erred in concluding that the jury had no evidentiary basis to determine the fair market value of Innotext's services. Stafford testified that the "going rate" for representatives in the automotive industry was a three percent commission on sales. Stafford said that he knew this from being in the business for so many years. Stafford also testified that he called other representatives in the business to confirm it. Petra'Lex USA cross-examined Stafford regarding this testimony and presented no evidence to the contrary. Therefore, taking the evidence in the light most favorable to Innotext, three percent commissions could be the fair market value for a representative's services in the automotive industry. Three percent of $22,000,000 is $660,000; there is no speculation in that calculation. Alternatively, the jury was presented with evidence that Innotext already received one-percent commissions from the sales to Fairway.

Therefore, the dismissal of Count IV's unjust enrichment claim will be vacated.

## CONCLUSION

The district court's dismissal of Counts I, II, and IV is VACATED and these claims are REMANDED for further proceedings. The district court's dismissal of Count III is AFFIRMED.